**UNIVERSAL COMPUTER SYSTEMS, INC., Universal Computer Consulting, Ltd., Universal Computer Services, Inc., and Dealer Computer Services, Inc., Appellants,**

v.

**DEALER SOLUTIONS, L.L.C., Dealer Solutions Holdings, Inc., ADP, Inc., SMC Investment, Inc. f/k/a SWT Investments, Inc., Southwest Toyota, Inc. d/b/a Sterling McCall Toyota, SMC Luxury Cars, Inc. d/b/a Sterling McCall Lexus, and Business Solutions, Inc., Appellees,**

**ADP, Inc., Cross–Appellant,**

v.

**Universal Computer Systems, Inc., Cross–Appellee.**

**No. 01–04–01088–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 23, 2005.

Rehearing Overruled Dec. 15, 2005.

John C. Allen, Houston, TX, for Appellants.

John L. Dagley, Campbell Harrison & Wright, Robin L. Harrison, Campbell Harrison & Dagley, L.L.P., Christopher M. Brown, Jenkens & Gilchrist, Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

JANE BLAND, Justice.

The parties in this trade secrets case agreed to arbitrate their claims against each other, and did so, but not before a lengthy discovery battle in the trial court. The trial court confirmed the arbitrators' decision, from which the losing parties appeal. Appellate review of the confirmation of arbitration decisions is very limited, as such decisions are meant to be final in all but exceptional cases. We hold that the facts presented here are not exceptional under the applicable caselaw. We further hold that the trial court should not have issued a discovery order limiting the presentation of certain evidence before the arbitrators, but the arbitrators allowed the evidence and considered it in any event, thus ameliorating any harm. We therefore affirm the trial court's confirmation of the arbitrators' decision.

Appellants Universal Computer Systems, Inc., Universal Computer Consulting, Ltd., Universal Computer Services, Inc., and Dealer Computer Services, Inc. (collectively "UCS") appeal the judgment confirming an arbitration award in favor of appellees Dealer Solutions, L.L.C., Dealer Solutions Holdings, Inc. (collectively "DSI"), SMC Investment, Inc. f/k/a SWT Investments, Inc., Southwest Toyota, Inc. d/b/a Sterling McCall Toyota, SMC Luxury Cars, Inc. d/b/a Sterling McCall Lexus (collectively "Sterling McCall"), and Business Solutions, Inc. ("BSI"), and cross-appellant ADP, Inc. ("ADP"). UCS contends that (1) the trial court had no authority to enter an order defining the scope of UCS's trade secrets claim to be heard at the arbitration hearing; (2) the trial court abused its discretion by imposing this discovery sanction before sending the case to arbitration; and (3) the arbitrators' decision is a gross mistake because the arbitrators (a) ignored the plain and

unambiguous language of a license agreement between UCS and Sterling McCall, (b) failed to recognize three Texas cases involving trade secret waiver, (c) found that DSI did not use UCS's trade secrets, (d) failed to recognize disgorgement damages, and (e) found that UCS's trade secret misappropriation claim is preempted by federal copyright law. In its cross-appeal, ADP asserts that, although the arbitrators correctly decided the preemption issue, should we decide otherwise, then ADP is entitled to injunctive relief.

### Factual and Procedural Background

UCS provides computer systems to car dealerships. In 1985, UCS contracted to license software to Sterling McCall. The contract required Sterling McCall to keep confidential "the programs and software" covered under the agreement. The contract also contained a provision requiring arbitration of "any claim, grievance, or controversy between customer and UCS . . . arising out of this agreement[.]"

In 1994, Sterling McCall and BSI, a software consulting firm, contracted to develop a dealer management computer system called "CARMan" to replace Sterling McCall's existing UCS system. The following year, Sterling McCall and BSI formed another entity, DSI, to continue developing the CARMan system. DSI employees had offices at the Sterling McCall body shop and had access to the UCS computer system. In early 1997, DSI displayed CARMan at the National Automobile Dealers Association annual convention. ADP acquired DSI in early 1999.

UCS sued in March 1999, alleging that appellees misappropriated UCS's trade secrets by accessing the UCS software at Sterling McCall to assist in designing and perfecting CARMan. In addition, UCS

alleged that Sterling McCall breached the confidentiality provision of its license agreement with UCS. ADP counter-claimed for misappropriation of trade secrets against UCS, alleging that UCS obtained ADP's software without permission and used it to develop competing products.

*The Discovery Dispute*

In April 1999, DSI propounded interrogatories to UCS asking it to identify each trade secret it contended DSI had misappropriated. UCS responded by naming its various software applications and programs. Dissatisfied with UCS's response, DSI moved to compel UCS to supplement its answers to the interrogatories with information specifically identifying the trade secrets DSI allegedly misappropriated. Pursuant to the recommendation of the special master appointed by the trial court to handle discovery disputes, the court granted DSI's motion to compel.

UCS filed a supplemental response in which it clarified that DSI and BSI allegedly "accessed every UCS software application used at [Sterling McCall,]" all of which UCS provided on a confidential basis. Still dissatisfied with UCS's response, DSI filed a second motion to compel. Pursuant to the special master's recommendation, the trial court granted DSI's second motion to compel,[1] stayed all discovery by UCS, and ordered UCS to pay DSI $250 in attorney's fees.

In its second supplemental response, UCS clarified that DSI allegedly had "misappropriated the architecture, structure, and design" of the overall UCS computer system at Sterling McCall, as well as the individual application packages. DSI filed another motion to compel, asserting that UCS's response "failed to specifically identify a single trade secret that UCS might have." On June 15, 2000, the trial court, on recommendation of the special master, once again granted DSI's motion to compel. Specifically, the court ordered UCS to supplement its response as follows:

[UCS] shall amend [its] answers to Defendants' First Set of Interrogatories ... to specifically and separately identify, as [it] ha[s] heretofore failed to do, ... each particular process, formula, pattern, device, compilation of information, or other matter that is the subject of this case that [UCS] contend[s] is a trade secret accessed or misappropriated by [appellees], by separately stating each such trade secret and describing the nature, subject matter, and details of each such trade secret with sufficient particularity to show its unique and secret nature to separate it from the general knowledge of those involved in automobile dealership management and the specific knowledge of those skilled in automobile dealership management systems.

....

If [UCS] claim[s] that the overall "structure, architecture and design of its computer system as a whole" is a trade secret misappropriated by [appellees], [UCS] shall specifically identify such system as a trade secret and describe with sufficient particularity how its' [sic]

---

1. Specifically, the trial court ordered UCS, in its supplemental response, to "state specifically the identity of each 'functionality,' 'data field,' 'rule,' 'reflex,' 'structure,' 'design,' 'architecture,' 'integration or combination of various components,' 'negative knowledge,' 'method or process utilized for manipulation information,' 'trigger,' 'calculation code,' 'formula,' 'distribution,' and 'format, content, sequence, total structure and record selection of various reports,' or other feature, function or element of [UCS's] automobile dealership management system or related written materials that is the subject of this case that [UCS] contend[s] is a trade secret accessed or misappropriated by [appellees]. Each trade secret claimed by [UCS] shall be separately identified by [it] in such answers."

combination of identified trade secret and non-trade secret characteristics, features functionalities and components interact and work together, and are adapted, implemented, integrated and applied to form a whole unified process, design and operation which is unique and secret in combination and which separates it from the general knowledge of those involved in automobile dealership management and specific knowledge of those skilled in automobile dealership management systems.

The trial court also continued the discovery stay against UCS and ordered it to pay DSI $500 in attorney's fees.

UCS moved to set aside the trial court's June 15, 2000 order. The trial court held an evidentiary hearing on UCS's objection on July 10–11, 2000, and UCS supplemented its response for a third time on July 14, 2000. In its third supplemental response, UCS stated that

> DSI misappropriated the architecture, structure, and design of the UCS computer system as a whole.... UCS' unique combination of features and functions into a unified and integrated computer system, and the way those components fit together to form the unique whole, was a protectable trade secret that was misappropriated by DSI.

Along with its third supplemental response, UCS also filed a proposed order referring the case to arbitration. In a letter dated July 14, 2000, DSI objected to UCS's third supplemental response, but advised the trial court that the parties had agreed to the entry of an order referring the case to arbitration.

The trial court held another hearing on August 7, 2000, at which time it upheld its June 15, 2000 order and advised UCS that it would be required to file a fourth supplemental response by September 18, 2000. The trial judge also informed the parties that he would grant their agreed order to arbitrate, but would not sign it until October 2, 2000.

UCS filed its fourth supplemental response on September 18, 2000 and attached thousands of pages of information describing how the UCS software works.[2] DSI requested and set a hearing for October 16, 2000 concerning the trial court's anticipated entry of the agreed order to arbitrate. DSI then filed a motion to dismiss for discovery abuse based on UCS's alleged failure to identify a single trade secret.

The trial court signed the agreed order to arbitrate on October 2, 2000. One week later, DSI moved to set aside the arbitration order pending resolution of its motion to dismiss. The trial court granted DSI's motion, withdrew the arbitration order, and ordered that the agreed order to arbitrate would "be enforced at a future date."

On January 25, 2001, the trial court entered an order on DSI's motion to dismiss, finding that although UCS had failed to adequately answer the interrogatories, sanctions were not yet justified. Instead, the court "established a presumption of the non-existence of any trade secret ... claimed by [UCS], subject to [UCS] being required during the next 30 days to adequately answer such interrogatories as di-

---

**2.** In response to the trial court's June 15, 2000 order that required UCS to describe its alleged trade secret with more specificity, UCS stated, "This section of material provides examples of seven software applications and their particular role in identifying the UCS system on a whole as a trade secret. Within each document, programs and fields are described with particularity to the interaction of UCS trade secrets and non-trade secrets that have been adapted in such a way as to form a complete unified process which is unique and secret so as to be separated from general dealership knowledge."

rected and to rebut the presumptions of the non-existence of trade secrets[.]" The court also observed that "[UCS] ha[s] stipulated that the only trade secret being claimed by [it] in th[is] action is the overall structure, architecture and design of its computer system as a whole and not any individual process, formula, pattern, device or compilation of information or other matter."

UCS filed its fifth supplemental response on February 21, 2001, asserting that its data fields, "unique combination of functionality of [its] software programs[,]" overall structure and architecture of its software programs, unique formats of the reports generated by its software, and "combination of reporting functionality" are all trade secrets. DSI subsequently filed a second motion to dismiss for discovery abuse based on UCS's alleged refusal to specifically describe any trade secret.

On December 10, 2001, pursuant to the special master's recommendation, the trial court denied DSI's second motion to dismiss, but ordered that "[UCS]'s evidence in support of its claim that its automobile dealership management software system is a trade secret shall be limited to its proof set forth in its responses and supplemental responses to interrogatories submitted to [appellees] prior to September 1, 2001." Two days later, UCS again moved to compel arbitration. DSI responded that, before ruling on the motion to compel arbitration, the trial court should clarify the evidentiary limitation imposed in its December 10, 2001 order.

After holding a hearing, the trial court granted in part and denied in part the motion to compel arbitration and ordered as follows:

> All parties and all claims alleged in this case shall be referred to arbitration for

the resolution of such claims. However, the Court's order referring this matter to arbitration will be entered by the Court only after (1) [appellees] have an opportunity to seek clarification of the December 10, 2001 Order denying Defendants' Second Motion to dismiss for Discovery Abuse from the Special Master ..., and (2) all parties have had an opportunity to object to the Special Master's order and obtain a ruling on such objections by the Court.

UCS filed a petition for a writ of mandamus in this Court, complaining of the trial judge's partial denial of its motion to compel arbitration. *In re Universal Computer Sys., Inc.*, No. 01–02–00343–CV, 2002 WL 538978, at *1 (Tex.App.-Houston [1st Dist.] Apr. 8, 2002, orig. proceeding) (not designated for publication). We declined to grant mandamus relief. *Id.*

On May 9, 2002, the trial court clarified its December 10, 2001 order as follows:

> [UCS] ha[s] stipulated that the only trade secret being claimed by [it] in [its] action is the overall structure, architecture and design of [its] computer system as a whole and not any individual process, formula, pattern, device or compilation of information or other matter.
>
> [UCS's] evidence identifying and describing [its] claimed trade secret shall be limited to [its] interrogatory responses served on February 21, 2001, which [UCS] ha[s] stipulated are a complete description of [its] claimed trade secret.

With these orders in hand, the parties proceeded to arbitration.

*The Arbitration*

A panel of three arbitrators conducted the arbitration hearing, which lasted three weeks.[3] After noting UCS's stipulation

---

3. Gary McGowan, the Honorable Susan Sous- san, and the Honorable Alvin Zimmerman

regarding the theory of its case set forth in the trial court's January 25, 2001 order, the arbitrators initially decided to "follow the [c]ourt's order," and "hold [UCS] to its burden of structure, architecture, and design." However, when DSI objected that UCS's evidence exceeded its February 21, 2001 interrogatory responses, the arbitrators allowed the evidence and decided to carry the issue with the case.[4] Thereafter, on numerous occasions, the arbitrators declined to limit the testimony or introduction of evidence by UCS based on the trial court's May 9, 2002 order. UCS proceeded to put on nearly two weeks of testimony, followed by one week of testimony from appellees.

The arbitrators issued their corrected decision on November 25, 2003. A majority of the panel found as follows:

> Under the Order of May 9, 2002, the only trade secret claimed by UCS is the overall structure, architecture and design of its computer system as a whole and not any individual process, formula, pattern, device or compilation of information or other matter. May 9, 2002 Order. UCS's evidence identifying and describing the claimed trade secret is limited to its interrogatory responses served on February 21, 2001.... Because UCS's February 21, 2001 interrogatory responses do not in fact describe overall structure, architecture and design of the UCS computer system as a

whole, UCS is barred from proving the necessary element of a claim for misappropriation of trade secrets.

> Even if UCS's evidence describing its alleged trade secret were not limited to UCS's February 21 Responses, UCS's evidence at trial demonstrated, at most, that some defendants obtained from the UCS system a partial list of UCS data fields, features, and functionalities. These do not constitute the overall architecture, structure, and design of the UCS system as a whole. Furthermore, in light of the unrebutted direct evidence of the substantial differences between CARMan and UCS, the circumstantial evidence presented by UCS as to misappropriation and use does not meet UCS' burden to prove these elements by a preponderance of the evidence.

> UCS has failed to establish the existence of a trade secret other than its code, which was not misappropriated by defendants.

A majority of the panel also decided that, even though it was "unnecessary" to reach the copyright preemption issue, given the majority's finding that UCS had failed to prove its trade secret misappropriation claim, the panel would decide the issue because the parties had extensively briefed it. Relying on Texas caselaw,[5] a majority of the arbitration panel concluded

---

comprised the arbitration panel.

4. Specifically, the chair arbitrator ruled as follows:

> ARBITRATOR ZIMMERMAN: Right now we're choosing to kind of put our foot in the water and walk through this for a while and see where it takes us. So, we're not preruling that your objection is right or wrong; we're going to carry your objection. We're not preruling whether he's overstepping his bounds or not. And that's what we tried to relate to everybody. This is delicate waters

with a lot of hills and valleys that we're, frankly, trying to feel our way through.

5. *See Butler v. Continental Airlines, Inc.,* 31 S.W.3d 642 (Tex.App.-Houston [1st Dist.] 2000, pet. denied); *see also Butler v. Continental Airlines, Inc.,* No. Civ.A.01–2194, 2001 WL 1509545 (S.D.Tex. Nov. 19, 2001); *Microsource, Inc. v. Superior Signs, Inc.,* No. CIV. A.3:97–CV–2733–G, 1998 WL 119537 (N.D.Tex. Mar. 9, 1998); *Butler v. Continental Airlines, Inc.,* 116 S.W.3d 286 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

that federal copyright law preempted UCS's claim for misappropriation of trade secrets.

With respect to ADP's counterclaim, a majority of the panel found that UCS misappropriated ADP's trade secret object code, but ADP's misappropriation claim similarly was preempted. The panel majority noted that, "[i]f this legal conclusion [regarding preemption] is incorrect, ADP would be entitled to an injunction prohibiting UCS from running ADP's code from the UCS offices either by way of a dial-up modem or on a system it has misappropriated, or by any other means."

Following the arbitration proceeding, DSI and ADP moved to confirm the arbitration award,[6] while UCS moved to vacate the award. The trial court confirmed the arbitration award on December 30, 2003.

## Analysis

### Pre–Arbitration Orders

■ UCS contends that the trial court abused its discretion by not sending the case immediately to arbitration and by seeking to limit the evidence UCS could introduce at the arbitration hearing through discovery orders entered after the case should have been sent to arbitration. UCS characterizes the trial court's May 9, 2002 order restricting the evidence UCS could introduce at the arbitration hearing as an improper death-penalty sanction.

■ "Once a party seeking to compel arbitration establishes that an agreement [to arbitrate] exists ..., and that the claims raised are within the agreement's scope, the trial court has no discretion but to compel arbitration and stay its proceedings pending arbitration." *Cantella & Co. v. Goodwin*, 924 S.W.2d 943, 944 (Tex.

1996) (orig.proceeding) (quotation omitted); *see also Pepe Int'l Dev. Co. v. Pub Brewing Co.*, 915 S.W.2d 925, 929 (Tex. App.-Houston [1st Dist.] 1996, no writ) ("If the court finds the arbitration provision valid, it shall order arbitration."); *In re Jebbia*, 26 S.W.3d 753, 757 (Tex.App.-Houston [14th Dist.] 2000, orig. proceeding) ("If the movant has proven there is an arbitration agreement, as a matter of law, the court must compel arbitration, and a presumption arises that all disputed issues between the parties must be arbitrated."). Furthermore,

> in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the [party']s claim ... is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious."

*AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649–50, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Am. Mfg. Co.*, 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960)).

Thus, once the parties presented the agreed order to compel arbitration and UCS moved to compel arbitration, the trial court should not have delayed in referring the case to arbitration to undertake fur-

---

6. ADP "expressly reserve[d] its right to complain in the event of an appeal of the part of the Award holding that it shall take nothing on its claims[.]"

ther discovery matters and to enter orders attempting to curtail the proceedings before the arbitrators as a result of its discovery rulings. *See John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964) (" '[P]rocedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.").[7]

■ Both the record and the arbitrators' decision reflect, however, that notwithstanding the trial court's order, the arbitrators ultimately considered all of UCS's evidence—not just the matters set forth in its interrogatory responses. In particular, although DSI objected that UCS's presentation of evidence to the arbitration panel exceeded the scope of its February 21, 2001 interrogatory responses, in contravention of the trial court's May 9, 2002 order, the arbitrators allowed UCS to adduce two weeks of testimony. UCS neither contended that it had additional evidence to present nor objected that the arbitrators had precluded it from introducing any further evidence because of the trial court's order. Moreover, UCS did not argue in closing that its ability to present evidence was restricted.[8]

The arbitration panel majority made extensive findings of fact. It then presented alternative grounds to support its judgment. First, it concluded that the trial court's order kept UCS from raising the evidence to support a trade secret misap-

propriation claim. Second, the panel concluded that appellees did not misappropriate trade secrets, after considering *all* of UCS's evidence:

> Even if UCS's evidence describing its alleged trade secret were not limited to UCS's February 21 Responses, UCS's evidence at trial demonstrated, at most, that some defendants obtained from the UCS system a partial list of UCS data fields, features, and functionalities. These do not constitute the overall architecture, structure, and design of the UCS system as a whole. Furthermore, in light of the unrebutted direct evidence of the substantial differences between CARMan and UCS, the circumstantial evidence presented by UCS as to misappropriation and use does not meet UCS' burden to prove these elements by a preponderance of the evidence.

We therefore hold that UCS has not shown that the trial court's May 9, 2002 order probably caused the rendition of an improper judgment, because the arbitration panel majority alternatively concluded that UCS did not meet its burden based upon the evidence. *See* TEX.R.APP. P. 44.1(a)(1) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of probably caused the rendition of an improper judgment[.]").

---

**7.** In their brief, appellees contend that the trial court had the authority to enter the May 9, 2002 order under section 171.086 of the Texas General Arbitration Act, which enables a court to enter any order "needed to permit the arbitration to be conducted in an orderly manner and to prevent improper interference or delay of the arbitration." TEX. CIV. PRAC. & REM.CODE ANN. § 171.086(a)(6) (Vernon 2005). However, the trial court issued the May 9, 2002 order to resolve the parties' existing discovery dispute—not to facilitate the arbitration proceeding pursuant to section

171.086. As such, we reject appellees' contention that the trial court acted within its statutory authority.

**8.** In fact, at the close of the arbitration hearing, UCS's Chairman and CEO told the panel, "I thank you-all for your attention. It's been a long three weeks. You-all have seen lots of paper. I appreciate the fact that you-all have given us a hard lesson. I feel like I have had my day in court."

*The Arbitration Decision*

UCS contends that the arbitrators made a gross mistake by (1) ignoring the plain and unambiguous language of the license agreement between UCS and Sterling McCall, (2) failing to address three Texas cases involving trade secret waiver, (3) finding that DSI did not use UCS's trade secrets, (4) failing to recognize disgorgement damages, and (5) finding that UCS's trade secret misappropriation claim is preempted by federal copyright law. Appellees respond that because the parties agreed the Texas General Arbitration Act [9] governs this arbitration, the Texas common law "gross mistake" standard is inapplicable. Rather, appellees assert, UCS is confined to raising one or more of the four exclusive grounds for vacatur set forth in the Texas General Arbitration Act.

We agree that the Texas General Arbitration Act governs this dispute. Although the arbitration provision contained in the license agreement between UCS and Sterling McCall does not reference the Texas General Arbitration Act,[10] the parties' subsequent Agreed Order to Stay Action and Compel Arbitration specifically incorporates it:

> The final arbitration award shall be subject to appeal, by way of a motion to modify, correct or vacate all or any part of the award filed in this Court and, thereafter, to the courts of appeals having jurisdiction, pursuant to the Texas General Arbitration Act.

> To the extent not addressed herein, the rules of the Texas General Arbitration Act shall govern the arbitration.

We therefore conduct our review under the Texas General Arbitration Act.

Pursuant to the Texas General Arbitration Act, a court may vacate an arbitration award under only four circumstances: (1) "the award was obtained by corruption, fraud, or other undue means;" (2) there was evident partiality, corruption, or willful misconduct by an arbitrator that prejudiced the rights of a party; (3) the arbitrators exceeded their powers, refused to postpone the hearing on good cause shown, refused to hear material evidence, or conducted the hearing in a substantially prejudicial manner; or (4) "there was no agreement to arbitrate, the issue was not adversely determined in a proceeding under Subchapter B, and the party did not participate in the arbitration hearing without raising the objection."[11] TEX. CIV. PRAC. & REM.CODE ANN. § 171.088(a)(1)-(4) (Vernon 2005). UCS does not contend any of these circumstances apply to this arbitration proceeding.

Appellees urge that UCS is limited to these statutory grounds for vacatur, and thus UCS's appeal is without merit. We note, however, that the Texas Supreme Court recently declined an invitation to hold that a party governed by the Texas General Arbitration Act is limited to the statutory grounds for vacatur and cannot rely upon the common law "gross mistake" standard. *Callahan & Assocs. v. Orangefield Indep. Sch. Dist.*, 92 S.W.3d 841, 844 (Tex.2002). After observing that "[n]either party disputes that the [Texas General Arbitration] Act governs the contract[,]" and "[t]he statutory grounds allowing a court to vacate ... an award are limited to those the Act expressly identifies[,]" the

---

9. TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.001–.096 (Vernon 2005).

10. The provision does state that "[i]f the arbiters fail to select a third [arbiter] within ten (10) days, or should either party hereto fail to select an arbiter, he shall be chosen by a District Judge serving Harris County, Texas."

11. Subchapter B governs motions and proceedings to compel or stay arbitration.

Texas Supreme Court "assume[d] without deciding that [petitioner] may rely on the gross mistake standard under the common law to attack the arbitrator's award[.]" *Id.* Thus, like the Texas Supreme Court, we assume without deciding that UCS may rely on the common law gross mistake standard in this case in seeking to set aside the trial court's confirmation of the arbitrators' decision.

 Yet, our review of an arbitration decision is "extremely narrow" because Texas law favors arbitration. *IPCO-G. & C. Joint Venture v. A.B. Chance Co.*, 65 S.W.3d 252, 256 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). An arbitration award has the same effect as the judgment of a court of last resort,[12] and a reviewing court may not substitute its judgment for that of the arbitrators merely because it would have reached a different result. *J.J. Gregory Gourmet Servs., Inc. v. Antone's Imp. Co.*, 927 S.W.2d 31, 33 (Tex. App.-Houston [1st Dist.] 1995, no writ). Because arbitration is favored as a means of dispute resolution, every reasonable presumption must be indulged to uphold the arbitrators' decision, and none is indulged against it. *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex.2002). Review is so limited that a court may not vacate an arbitration award even if it is based upon a mistake of fact or law. *Vernon E. Faulconer, Inc. v. HFI Ltd. P'ship*, 970 S.W.2d 36, 39 (Tex.App.-Tyler 1998, no pet.) (citing *Jamison & Harris v. Nat'l Loan Investors*, 939 S.W.2d 735, 737 (Tex. App.-Houston [14th Dist.] 1997, writ denied)).

 Texas common law allows a reviewing court to set aside an arbitration award "only if the decision is tainted with fraud, misconduct, or gross mistake as would imply bad faith and failure to exercise honest judgment." *IPCO*, 65 S.W.3d at 256 (quoting *Teleometrics Int'l, Inc. v. Hall*, 922 S.W.2d 189, 193 (Tex.App.-Houston [1st Dist.] 1995, writ denied)). "Gross mistake results in a decision that is arbitrary or capricious. An honest judgment made after due consideration given to conflicting claims, however erroneous, is not arbitrary or capricious." *Bailey & Williams v. Westfall*, 727 S.W.2d 86, 90 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). The party seeking to vacate an arbitration award has the burden of demonstrating how the arbitrators made a gross mistake. *Anzilotti v. Gene D. Liggin, Inc.*, 899 S.W.2d 264, 267 (Tex.App.-Houston [14th Dist.] 1995, no writ).

 UCS asserts that the arbitrators made a gross mistake for several reasons. First, UCS contends that the panel majority improperly ignored the license agreement between UCS and Sterling McCall as a whole, and instead adopted a "strained interpretation" that parsed out the individual phrases "software," "program," and "licensed copy" as including only the raw code. UCS insists that this interpretation cannot be squared with the purpose of the agreement—which was to keep the programs, software, and manifestations of the software confidential—and is "sufficiently absurd" to justify vacatur of the award. Appellees respond that the arbitration panel heard evidence, and properly found, that UCS publicly disclosed (1) the functionality of the UCS system, (2) the data items the UCS system uses to perform its operations, (3) the manuals describing how the UCS system operates, (4) the screens displayed on the end user's terminal on the UCS system, and (5) the reports or output

---

**12.** This is because "[s]ubjecting arbitration awards to judicial review adds expense and delay, thereby diminishing the benefits of arbitration as an efficient, economical system for resolving disputes." *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex.2002).

from the UCS system. Thus, appellees contend, the panel majority properly interpreted the license agreement narrowly.

It is not our province to determine the proper construction of the parties' license agreement. *See House Grain Co. v. Obst,* 659 S.W.2d 903, 907 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e.) (holding that "[i]t is not necessary for us to determine the proper construction of the contract between the parties" because to do so would allow the parties "to essentially re-litigate the arbitration proceedings"). Instead, our review is limited to whether the arbitrators' failure to adopt UCS's interpretation of the license agreement constitutes bad faith or a failure to exercise honest judgment. The record contains conflicting evidence as to the interpretation and breach of the agreement. Thus, nothing before us suggests that the arbitrators acted in bad faith or failed to exercise honest judgment, both with respect to UCS's claim for misappropriation of trade secrets and its claim for breach of contract against Sterling McCall. We hold UCS's first ground for vacating the award to be without merit.

■ Next, UCS asserts that the arbitrators made a gross mistake by failing to address three leading Texas cases regarding trade secret waiver.[13] According to UCS, the panel majority incorrectly found that UCS lost any trade secret protection by demonstrating the UCS system and distributing software overviews to thousands of third parties without expressly obligating the third parties to maintain confidentiality. UCS also contends the arbitrators' finding that DSI did not use UCS's trade secrets because the DSI software is not a copy of the UCS system is a "gross distortion of well-settled law[.]"

However, "[t]hese alleged errors in the application of substantive law by the arbitrators during the proceedings in arbitration are not reviewable by the court on a motion to vacate an award." *Jamison,* 939 S.W.2d at 737; *see also Baker Hughes Oilfield Operations, Inc. v. Hennig Prod. Co.,* 164 S.W.3d 438, 443 (Tex.App.-Houston [14th Dist.] 2005, no pet.) ("Any error of law made by the arbitrators . . . cannot be reviewed by a court confirming the award."). Thus, we hold UCS's second and third grounds for vacating the award to be without merit.

■ Next, UCS contends that the arbitrators made a gross mistake in refusing to recognize disgorgement damages as measured by the value of the stolen trade secret. The arbitration panel majority concluded that, even had UCS proven its trade secret misappropriation claim, UCS did not prove that it sustained actual damages, and any unjust enrichment damages were speculative. In *Callahan,* the Texas Supreme Court considered whether a failure to award damages constitutes a gross mistake. *Callahan,* 92 S.W.3d at 843–44. The arbitrator in *Callahan* determined that the defendant was liable for the plaintiff's defective driveway, but failed to award damages despite the record evidence about the costs plaintiff incurred to replace the driveway. *Id.* The Texas Supreme Court held as follows:

[A]n arbitrator does not violate the common law simply by failing to award damages. *See Teleometrics Int'l, Inc. v. Hall,* 922 S.W.2d 189, 193 (Tex.App.-Houston [1st Dist.] 1995, writ denied) (Gross mistake, as a common law ground for setting aside an arbitration award, is

**13.** The authorities UCS identifies are *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763 (1958), *K & G Oil Tool & Service Co. v. G*

*& G Fishing Tool Service,* 158 Tex. 594, 314 S.W.2d 782 (1958), and *Schalk v. State,* 823 S.W.2d 633 (Tex.Crim.App.1991).

a mistake that implies bad faith or failure to exercise honest judgment.).

*Id.* at 844. Likewise, we hold that the arbitrators in this case did not commit a gross mistake sufficient to set aside the arbitration award by failing to award damages to UCS. Thus, we hold UCS's fourth ground for vacating the award to be without merit.

■ Finally, UCS contends that the arbitrators made a gross mistake in finding that its trade secret misappropriation claim is preempted by federal copyright law. According to UCS, the arbitrators based their decision on an "impossibly strained interpretation" of *Butler v. Continental Airlines, Inc.*, 31 S.W.3d 642 (Tex. App.-Houston [1st Dist.] 2000, pet. denied), and, in any event, that decision is not the majority view outside Texas. ADP asserts that Texas adheres to the minority rule, and the arbitrators therefore properly followed *Butler* in holding that trade secret misappropriation claims involving the wrongful copying of computer software are preempted by federal copyright law. However, on cross-appeal, ADP maintains that, should we disagree with the arbitrators' conclusion, then ADP is entitled to an injunction against UCS, as automatically provided for in the arbitration decision.

As we have discussed, we simply may not review "alleged errors in the application of substantive law by the arbitrators." *Jamison,* 939 S.W.2d at 737; *see also Monday v. Cox,* 881 S.W.2d 381, 385 (Tex. App.-San Antonio 1994, writ denied) ("The courts are not permitted to second-guess the correctness of an arbitrator's decision on the merits."). Rather, our review is confined to whether the record indicates the arbitrators acted in bad faith or failed to exercise honest judgment—not whether we agree or disagree with their application of the law. Here, the arbitrators relied on four Texas state and federal cases [14] in deciding the preemption issue, and we find nothing in the record indicating that the arbitrators acted in bad faith or failed to exercise honest judgment. Thus, we hold UCS's fifth ground for vacating the award to be without merit and overrule the issue raised in ADP's cross-appeal.

## Conclusion

We conclude that the trial court should not have issued a discovery order limiting the presentation of the evidence during the arbitration proceedings, but that the order did not affect the arbitrators' decision as to the merit of UCS's claims, and thus did not cause the rendition of an improper judgment. In addition, we conclude that the arbitrators did not commit a gross mistake in finding that UCS had failed to prove its trade secret misappropriation and breach of contract claims. Accordingly, we affirm the judgment of the trial court confirming the arbitration award. All pending motions are denied as moot.

---

14. *See Butler v. Continental Airlines, Inc.,* 31 S.W.3d 642 (Tex.App.-Houston [1st Dist.] 2000; pet. denied); *see also Butler v. Continental Airlines, Inc.,* No. Civ.A.01–2194, 2001 WL 1509545 (S.D.Tex. Nov. 19, 2001); *Micro-source, Inc. v. Superior Signs, Inc.,* No. CIV. A.3:97–CV–2733–G, 1998 WL 119537 (N.D.Tex. Mar. 9, 1998); *Butler v. Continental Airlines, Inc.,* 116 S.W.3d 286 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).