AMOCO D.T. COMPANY, Amoco X.T. Company, Amoco Y.T. Company, Swepi LP, Shell Land & Energy Company, Shell Onshore Ventures Inc., Shell K2, Inc., and Shell Everest, Inc., Appellants,

v.

OCCIDENTAL PETROLEUM CORPO-RATION, Occidental Permian Manager, LLC, Occidental Permian Ltd., and Oxy USA, Inc., Appellees.

No. 14–09–00651–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 17, 2011.

Craig Trively Enoch, Mandy J. Ford, Austin, Thomas T. Hutcheson, Warren W. Harris, Carrin F. Patman, Jeffrey L. Oldham, Caroline C. Pace, Houston, for appellants.

Deborah G. Hankinson, Brett David Kutnick, Dallas, Harvey G. Brown, Jr., Houston, John A. (Jad) Davis, Jr., Midland, for appellees.

Panel consists of Justices FROST, SEYMORE, and CHRISTOPHER.

## OPINION

CHARLES W. SEYMORE, Justice.

Amoco D.T. Company, Amoco X.T. Company, Amoco Y.T. Company (collectively, "Amoco appellants"), SWEPI LP, Shell Land & Energy Company, Shell Onshore Ventures Inc., Shell K2, Inc., and Shell Everest, Inc. (collectively "Shell appel-

lants")[1] entered into a purchase-and-sale agreement ("PSA") with Occidental Petroleum Corporation, Occidental Permian Manager, LLC, Occidental Permian Ltd., and Oxy USA, Inc. (collectively, "Oxy"). Pursuant to the agreement, Oxy made a demand for arbitration to resolve a contract dispute, and the case was submitted to arbitration. In a two-to-one decision, the arbitration panel decided in appellants' favor. Subsequently, Oxy discovered undisclosed information pertaining to an arbitrator's relationships with appellants. Oxy moved to vacate the award based on the arbitrator's evident partiality. Appellants filed suit in district court to enforce the arbitration decision. The trial court determined the evidence established evident partiality and vacated the arbitration award. We affirm.

## I. BACKGROUND

In 1997, the Amoco and Shell appellants created a partnership, Altura Energy Ltd. ("Altura"), and contributed their respective oil and gas holdings in the Permian Basin to Altura.[2] In 2000, appellants sold Altura to Occidental Petroleum Corporation pursuant to the PSA ("Altura transaction"). In the PSA, the parties agreed to resolve disputes through binding arbitration before a panel of three neutral arbitrators, whereby appellants and Oxy would each select an arbitrator, and the third arbitrator would be chosen by the party-selected arbitrators.

Oxy initiated arbitration in July 2006 after a dispute arose concerning interpretation of an environmental-conditions provision of the PSA. The arbitration panel was comprised of Shannon Ratliff (selected by Oxy), Thomas McDade (selected by appellants), and George Chapman (selected by Ratliff and McDade). As required, the arbitrators made disclosures regarding their connections to the parties and potential conflicts. In March 2007, during the course of the pre-arbitration proceedings, McDade left his law firm, McDade & Fogler, and became "of counsel" with the firm of Beck, Redden, & Secrest, L.L.P. ("Beck Redden").

Arbitration hearings began on October 16, 2007 and lasted a week. The panel issued its award on August 22, 2008. In a two-to-one decision, the panel ruled in appellants' favor, with McDade and Chapman as the majority and Ratliff dissenting. According to the PSA, the decision was "binding and nonappealable" except "as provided in the Federal Arbitration Act" ("FAA").

Subsequently, Oxy discovered undisclosed information concerning McDade's and Beck Redden's relationships with appellants that Oxy claims was evidence of McDade's evident partiality. See 9 U.S.C.A. § 10(a)(2) (West 2009). Oxy filed a motion requesting the arbitration panel to vacate its award, but the arbitrators unanimously agreed they lacked jurisdiction to consider the motion. Appellants filed a motion in district court seeking to confirm the panel's award. Oxy countered, seeking to vacate the award based on McDade's alleged evident partiality. The trial court signed a final judgment denying appellants' motion to confirm the arbitration award and granting Oxy's motion to vacate. The court also issued findings of fact and conclusions of law.

1. We use the term "appellants" when referring to Amoco appellants and Shell appellants jointly.

2. The exact details regarding formation of Altura are unclear from the record. For pur-

poses of this appeal, we glean facts relative to formation of Altura from the PSA and that section of the final arbitration award entitled "Preliminary Statement and Undisputed Facts."

## II. Standard of Review and Applicable Law

We begin with consideration of the trial court's standard for determining whether to confirm or vacate an arbitration award. Review of an arbitration award is "extraordinarily narrow." *Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564, 568 (Tex.App.-Dallas 2008, no pet.). The award has the same effect as a judgment of last resort, and all reasonable presumptions are indulged in favor of the award. *CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex.2002) (quoting *City of San Antonio v. McKenzie Constr. Co.*, 136 Tex. 315, 326 150 S.W.2d 989, 996 (1941)). An arbitration award governed by the FAA must be confirmed unless it is vacated, modified, or corrected under certain limited grounds. *See* 9 U.S.C.A. § 9 (West 2009); *Thomas James Assocs., Inc. v. Owens*, 1 S.W.3d 315, 319–20 (Tex.App.-Dallas 1999, no pet.). A party seeking to vacate an arbitration award bears the burden of presenting a complete record that establishes grounds for vacatur. *Williams*, 244 S.W.3d at 568. Under one such ground, a trial court may vacate an arbitration award "where there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C.A. § 10(a)(2).

The parties sharply disagree on the legal standard a Texas court should apply when considering whether an arbitrator was evidently partial under the FAA. Both sides recognize the United States Supreme Court's seminal evident-partiality decision, *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968). In Commonwealth Coatings, a supposedly neutral arbitrator failed to disclose that one of the parties to the arbitration was a regular customer of his engineering-consulting services, including on the projects underlying the parties' dispute. *Id.* at 146, 89 S.Ct. 337. In vacating the arbitration award, Justice Black wrote in an opinion joined by three justices:

> It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review. We can perceive no way in which the effectiveness of the arbitration process will be hampered by *the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias.*

*Id.* at 148–49, 89 S.Ct. 337 (emphasis added). This principle is known as the "impression of possible bias" or "appearance of bias" standard.

In a concurring opinion joined by two justices, Justice White began, "While I am glad to join my Brother Black's opinion in this case, I desire to make these additional remarks." *Id.* at 150, 89 S.Ct. 337 (White, J., concurring). Justice White expressed that "arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial." *Id.* at 150, 89 S.Ct. 337 (White, J., concurring). He further wrote,

> Of course, an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography. But it is enough for present purposes to hold, as

the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed.

*Id.* at 151–52, 89 S.Ct. 337 (White, J., concurring).

The majority of federal circuits have construed Justice Black's opinion as a mere plurality because, although Justice White stated that he joined Justice Black's opinion, the "substantial interest" standard announced by Justice White differed substantially from the "appearance of bias" standard utilized by Justice Black. *See, e.g., Positive Software Solutions, Inc. v. New Century Mortg. Corp.,* 476 F.3d 278, 281–83 (5th Cir.2007) (en banc) (explaining that the majority of federal circuits have concluded that Justice Black's opinion is a non-binding plurality decision and adopted a more stringent standard); *see also* Merrick T. Rossein & Jennifer Hope, *Disclosure and Disqualification Standards for Neutral Arbitrators: How Far to Cast the Net and What Is Sufficient to Vacate Award,* 81 St. John's L. Rev. 203, 212–13 (2007) (discussing split among federal circuits). Unsurprisingly, appellants seek application of the "substantial interest" standard, whereas Oxy urges application of the "appearance of bias" standard.

■ Appellants urge us to apply the standard recently annunciated by the Fifth Circuit in *Positive Software.* In *Positive Software,* after thoroughly analyzing Justice Black's and Justice White's opinions, the court concluded that Justice Black's opinion was a non-binding plurality opinion and that the proper standard for determining evident partiality under the FAA is whether a nondisclosure "involves a significant compromising relationship." *Id.* at 281–86. Of course, we need not follow *Positive Software* because Fifth Circuit opinions are persuasive, but not mandatory, precedent in Texas courts. *See Penrod Drilling Corp. v. Williams,* 868 S.W.2d 294, 296 (Tex.1993). However, we are required to follow applicable precedent from the Texas Supreme Court. *Id.*

In *Burlington N. R.R. Co. v. TUCO, Inc.,* the Texas Supreme Court reviewed an arbitration award for evident partiality under the Texas Arbitration Act ("TAA"). 960 S.W.2d 629, 632 (Tex.1997). In determining the proper standard for determining evident partiality, the court relied primarily on Justice Black's analysis of evident partiality in *Commonwealth Coatings. Id.* at 633–37. The court also considered the analyses employed by several state courts that interpreted "evident partiality" under their respective state statutes. *Id.* at 634–35. The court indicated that the standard for evident partiality should be the same under the FAA and the TAA:

> While this Court has not previously determined the scope of this standard, numerous courts in other jurisdictions have done so, as "evident partiality" is also a basis for vacating awards under the Federal Arbitration Act, *see* 9 U.S.C. § 10, as well as the arbitration statutes of many sister states.

*Id.* at 632.

■ The court recognized the differences between Justice Black's and Justice White's opinions and acknowledged that several federal and state courts were split on the application of *Commonwealth Coatings. Id.* at 633–35. The court noted that two Texas courts of appeals had adopted a standard for reviewing evident partiality that paralleled Justice Black's standard. *Id.* at 635 (citing *City of Baytown v. C.L. Winter, Inc.,* 886 S.W.2d 515 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (applying standard from Babcock to evident partiality review under TAA); *Babcock & Wilcox Co. v. PMAC, Ltd.,* 863 S.W.2d 225

(Tex.App.-Houston [14th Dist.] 1993, writ denied) (reviewing arbitration award governed by FAA and explaining, "A party seeking to vacate an award on the basis of evident partiality must prove the existence of facts which would establish a reasonable impression of the arbitrator's partiality to one party")). The court then discussed the strong policy for requiring up-front disclosure:

> To choose their arbitrators intelligently, however, the parties must have access to all information which might reasonably affect the arbitrator's partiality. This allows the parties to evaluate any potential bias at the outset, rather than shifting the burden to the courts to do so when a dissatisfied party challenges an award.

*Id.* Having considered interpretations of the evident-partiality standard by other courts, and policies supporting the evident-partiality rule, the court adopted a standard resembling Justice Black's standard:

> [A] prospective neutral arbitrator ... exhibits evident partiality if he or she does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality.

*Id.* at 636.

■■■ Although agreeing that an arbitrator need not disclose trivial relationships, the court explained that "evident partiality is established from the *nondisclosure itself,* regardless of whether the nondisclosed information necessarily establishes partiality or bias. Those courts which have failed to recognize a comparable standard have, we believe, needlessly involved themselves in evaluations of partiality that are better left to the parties." *Id.* at 636–37 (citations omitted). Furthermore, the court declined to hold that only direct financial relationships are required to be disclosed: "[P]arties should have access to all information that might reasonably affect the potential arbitrator's impartiality. This could obviously include, for example, a familial or close social relationship." *Id.* at 637. Finally, the court rejected the notion that an award should be affirmed when reasonable persons might debate whether the circumstances indicate evident partiality: "[T]he fact that a reasonable person could conclude that the [circumstances] *might* affect [the arbitrator's] impartiality triggers the duty to disclose." *Id.* at 639.

We conclude that *TUCO* prescribes the standard for determining evident partiality under either the TAA or FAA.[3] The supreme court's goal to foster a single standard for evident partiality is logical because the evident-partiality sections are substantially the same under the TAA and FAA. *Compare* 9 U.S.C.A. § 10(a)(2) ("[A] court ... may make an order vacating the award upon the application of any party to the arbitration ... where there was evident partiality or corruption in the arbitrators, or either of them."), *with* Tex. Civ. Prac. & Rem.Code Ann. § 171.088(a)(2)(A) (West 2011) ("On application of a party, the court shall vacate an award if ... the rights of a party were

---

3. Admittedly, in *TUCO*, the neutral arbitrator accused of evident partiality was selected by the other two party-selected arbitrators, 960 S.W.2d at 630, whereas McDade was selected only by the appellants. Thus, McDade, although undisputedly a neutral arbitrator, was not "selected by the parties or their representatives" as was the challenged arbitrator in *TUCO. Id.* at 636. However, this distinction is immaterial because the *TUCO* standard for evident partiality extends "to all neutral arbitrators, regardless of the method for their selection." *Houston Vill. Builders, Inc. v. Falbaum,* 105 S.W.3d 28, 32 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (citing *Mariner Fin. Grp., Inc. v. Bossley,* 79 S.W.3d 30, 32–33 (Tex.2002)).

prejudiced by ... evident partiality by an arbitrator appointed as a neutral arbitrator[.]").[4]

Moreover, the public policy for requiring up-front disclosure is the same under both statutes. *See Thomas James Assocs.,* 1 S.W.3d at 320–21 (applying *TUCO* standard in case governed by FAA because "the public policy of encouraging up-front disclosure of possible arbitrator bias or partiality is equally applicable to arbitrations governed by the TAA or the FAA"); *see also Perry Homes v. Cull,* 173 S.W.3d 565, 570–71 (Tex.App.-Fort Worth 2005) (applying *TUCO* in FAA case), *rev'd on other grounds,* 258 S.W.3d 580 (Tex.2008). Therefore, any change to the standard for determining evident partiality should emanate from the supreme court.

■ Accordingly, the same standard for determining evident partiality is applicable whether the arbitration is governed by the FAA or TAA. Courts decide whether the neutral arbitrator exhibited evident partiality by determining whether he failed to disclose facts which might, to an objective observer, create a reasonable impression of his partiality. *TUCO,* 960 S.W.2d at 636. Evidence of nondisclosure is, without more, sufficient to establish partiality regardless of whether the undisclosed information necessarily proves partiality or bias. *Id.* at 636. However, if an objective observer could not believe the undisclosed information might create a reasonable impression of partiality, the information is trivial and the arbitrator did not exhibit partiality by failing to disclose it. *Id.* at 636–37; *see also Mariner Fin. Grp., Inc. v. Bossley,* 79 S.W.3d 30, 32–33 (Tex.2002) ("[T]he consequences for nondisclosure are directly tied to the materiality of the unrevealed information.").

■ Having decided the legal standard for determining evident partiality, we next determine the standard an appellate court applies when reviewing the trial court's evident-partiality determination. We review *de novo* a trial court's decision to confirm or vacate an arbitration award. *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.,* 105 S.W.3d 244, 250 (Tex.App.-Houston [14th Dist.] 2003, pet. denied); *see also In re Chestnut Energy Partners, Inc.,* 300 S.W.3d 386, 397 (Tex. App.-Dallas 2009, pet. denied). Nevertheless, "[t]he 'evident partiality' question necessarily entails a fact intensive inquiry. This is one area of the law which is highly dependent on the unique factual settings of each particular case." *Bossley,* 79 S.W.3d at 34 (quoting *Lifecare Int'l, Inc. v. CD Med., Inc.,* 68 F.3d 429, 435 (11th Cir. 1995)). Although the ultimate question regarding whether an arbitrator exhibited evident partiality is one of law applied to facts, in order to determine the facts, the trial court will necessarily resolve conflicts in the evidence. We agree with the El Paso Court of Appeals's recent explanation relative to our review of fact findings underlying a trial court's decision to confirm or vacate an arbitration award:

> Legal issues must be reviewed *de novo.* But when a trial court undertakes to resolve fact disputes in the context of a claim of evident partiality or misconduct, the trial court's fact findings must be reviewed for legal and factual sufficiency while its legal conclusions will be reviewed *de novo.* Consequently, the standard of review we will employ depends on whether the trial court resolved any factual issues.

*Las Palmas Med. Ctr. v. Moore,* —— S.W.3d ——, —— (Tex.App.-El Paso 2010, pet. denied), 2010 WL 3896501, at *7.

---

4. At the time *TUCO* was issued, language pertaining to evident partiality was in section 171.014. For our purposes, the material portions of former section 171.014 and current section 171.088 are identical.

## III. Analysis

In its motion for vacatur, Oxy argued McDade exhibited evident partiality because he failed to disclose the following facts: (1) during the course of the arbitration, Beck Redden attorney David Gunn represented BP Products North America, Inc. ("BP Products"), a BP Amoco p.l.c. subsidiary, in mandamus proceedings in Texas; (2) during the course of the arbitration, a Beck Redden attorney began representing several BP Amoco p.l.c. subsidiaries; (3) Beck Redden represented Shell Oil Company from 1994 to 1999; and (4) after the arbitration panel issued its award, Shell designated McDade as an arbitrator in unrelated matter. We first consider Oxy's contention that McDade's partiality was exhibited by his failure to disclose that Gunn was contemporaneously representing BP Products in mandamus proceedings.

### A. Whether Oxy waived conflict by failing to investigate McDade's background

Appellants argue that Oxy waived any argument concerning the BP Products representation because Oxy had a duty to investigate McDade's background but failed to do so. According to appellants, Oxy could have easily performed an online search and discovered Beck Redden's representation of BP Products. Appellants presented the following affidavit testimony in support of this argument:

> On May 11, 2009, [a representative of the Amoco appellants] ran a search on Google with the terms "Beck," "Redden," and "Amoco." The fourth search result was the "Reply to Response to Petition for Writ of Mandamus" that BP Products North American, Inc. filed in a mandamus proceeding before the Texas Supreme Court in Cause No. 07–0119. David Gunn, an attorney for [Beck Red-

den], is listed as one of the counsel for BP Products on the first page of the Reply.... I also visited the Texas Supreme Court's website, which shows that the Reply was filed on February 20, 2007.

Appellants also argue that Oxy was presented with a "red flag" regarding McDade's partiality but declined to investigate. Specifically, McDade sent an ex parte letter to the Amoco appellants' counsel informing him of Beck Redden's potential conflicts with the Amoco appellants. The Amoco appellants' counsel informed McDade via letter that the Amoco appellants waived these conflicts; Oxy's counsel was copied on this letter. Oxy's counsel then sent McDade a letter requesting that he disclose Beck Redden's potential conflicts with Oxy. McDade never responded to this letter or made further disclosures to Oxy. Oxy later approved McDade's participation on the arbitration panel. During vacatur proceedings, Oxy contended that McDade's ex parte communications with the Amoco appellants' counsel was some evidence of his partiality. According to appellants, Oxy's failure to raise concerns regarding the ex parte communication before it approved McDade as one of the arbitrators established its willingness to waive McDade's and Beck Redden's potential conflicts. In its findings of fact, the trial court expressly found that Oxy did not waive its evident-partiality challenge because it was unaware of the Beck Redden representations. Further, appellants neither requested nor received a finding relative to whether a reasonable investigation would have revealed these representations.

We have found no case in which a Texas court determined whether an arbitrating party waives an arbitrator's conflicts if the party fails to investigate the arbitrator's background. In *Bossley*, the supreme

court specifically declined to decide this issue because, even assuming a duty to investigate existed, the evidence did not establish the complaining party could have discovered the information through investigation. 79 S.W.3d at 33.

In *Houston Village Builders, Inc. v. Falbaum*, our court was asked to decide whether arbitrating parties have a duty to investigate. 105 S.W.3d 28, 35 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). Similar to the supreme court in *Bossley*, this court did not address the issue, holding instead that the party opposing vacatur has the burden to prove waiver. *Id.* This court concluded the party opposing vacatur did not present evidence establishing that the party seeking vacatur would have discovered the information through "reasonable investigation." *Id.; see also J.D. Edwards World Solutions Co. v. Estes, Inc.*, 91 S.W.3d 836, 844 (Tex.App.-Fort Worth 2002, pet. denied) (concluding evidence did not support conclusion that losing party could have "easily discovered" full nature of arbitrator's relationship with winning party).

▆▆▆▆ Similarly, we conclude appellants failed to prove that a reasonable investigation would have resulted in Oxy's discovery of Beck Redden's representation of BP Products. A 2009 Google search does not necessarily reflect what a 2007 and 2008 search would have revealed. Further, Oxy was unaware that Beck Redden was involved in BP Products's petition for writ of mandamus and therefore had no reason to search the supreme court's website regarding the petition. Finally, Oxy's failure to investigate after its request for disclosures were unanswered is not evidence that Oxy was aware of, but waived, potential conflicts; Oxy could have reasonably interpreted McDade's failure to respond as an indication that no additional conflicts existed.[5] Accordingly, we hold appellants did not present evidence establishing that OXY would have discovered the BP Products representation through "reasonable investigation."[6]

## B. BP Products's connection to the arbitration proceedings

The following facts are undisputed:

- On January 16, 2007, apparently in anticipation of McDade joining Beck Redden, Beck Redden generated a conflict report using various Oxy, Amoco, and Shell search terms.

- Page fifteen of the conflict report indicates that Beck Redden attorney David Gunn represented BP Products in a matter described as "In Re: Texas City Explosion." The "Open Date" for this representation was "10/18/2006."

- BP Products is the sister company of BP America Production Company, which is the direct parent company of appellant Amoco D.T. and the "grandparent" company of appellants Amoco X.T. and Amoco Y.T.

- Gunn was one of several attorneys who filed a petition for writ of mandamus on behalf of BP Products in the Texas

---

5. Additionally, concluding that this situation necessitated further action from Oxy would shift the burden of disclosure from McDade to Oxy, contravening the well-established rule that the duty to disclose rests on the arbitrator. *See Bossley*, 79 S.W.3d at 33 ("It is well-established ... 'a neutral arbitrator has a duty to disclose dealings of which he or she is aware that might create an impression of possible bias.'" (quoting *Commonwealth Coatings*, 393 U.S. at 149, 89 S.Ct. 337)).

6. Appellants also apparently argue that Oxy purposefully failed to investigate McDade's background because Oxy investigated arbitrator Chapman's background. However, appellants do not cite evidence supporting such a finding.

Supreme Court on February 14, 2007. Gunn was not the lead attorney or signatory of the petition and did not participate in oral argument for the petition.

- BP Products was seeking a writ of mandamus to prevent the apex deposition of Lord John Browne, CEO of BP Amoco p.l.c., the ultimate parent of BP Products and the Amoco appellants.
- The supreme court issued its opinion on the petition on January 25, 2008.
- McDade had actual knowledge that Beck Redden was representing BP Products but did not disclose this representation to Oxy.
- Heather Skinazi, an in-house attorney for Occidental Petroleum Corporation, swore in an affidavit that she was unaware of Beck Redden's representation of BP Products until after the arbitration panel issued its award and that, to her knowledge, "no one else at Oxy was aware of this information before the issuance of [the award.]" Similarly, John A. "Jad" Davis and Deborah G. Hankinson, each an attorney of record for Oxy, swore in affidavits that they were unaware of Beck Redden's representation of BP Products until after the arbitration panel issued its award.

Appellants argue BP Products's tenuous relationship to the Amoco appellants (BP Products is the sister company of a parent of the Amoco appellants) rendered the nondisclosure trivial. Appellants cite *Beck Suppliers, Inc. v. Dean Witter Reynolds, Inc.*, in which an Ohio court of appeals determined evident partiality was not established by proof that the arbitrator's law firm had previously represented the parent and sister companies of the prevailing party. 53 Ohio App.3d 98, 558 N.E.2d 1187, 1192–93 (1988) (per curiam). Specifically, the court expressly applied the standard articulated in Justice White's Commonwealth Coatings concurrence and held the " 'relationship' between the arbitrator and the [prevailing party] is too indirect and remote to substantiate any inference of bias. [Cases in which bias was inferred] are therefore distinguishable from the case sub judice because they involved a direct relationship between the prevailing party and the arbitrator." *Id.* at 1193 (citation omitted). Additionally, appellants argue that Oxy's reliance on *Schmitz v. Zilveti* is misplaced because the undisclosed representation in that case is inapposite; the Ninth Circuit Court of Appeals concluded the arbitrator's firm's representation of the *parent company* of an arbitrating company exhibited evident partiality. 20 F.3d 1043, 1049 (9th Cir.1994).

■ We recognize the degree of corporate distinction between the Amoco appellants and BP Products and that such may be a factor in determining evident partiality. *See GE Commercial Distrib. Fin. Corp. v. Momentum Transp. Servs., L.L.C,* No. 09-09-00162-CV, 2009 WL 6327471, at *8 (Tex.App.-Beaumont Apr. 8, 2010, no pet.) (mem. op.) (concluding undisclosed relationship did not establish evident partiality because the relationship involved a separate and distinct corporation). However, other factors bear on whether the BP Products representation was trivial. As noted above, it is undisputed McDade was aware of Beck Redden's representation of BP Products and this representation appeared on Beck Redden's conflict report. It is also undisputed that several BP entities signed the closing document to the Altura transaction, including ultimate parent BP Amoco p.l.c. Further, even if McDade was unaware of BP's connection to Amoco, evidence was presented at the arbitration hearings concerning the 1999 merger between BP and Amoco. Accordingly, there were several facts indicating

BP's involvement in the underlying transaction, and McDade had a duty to determine whether the BP Products representation might create a reasonable impression of his impartiality thus requiring disclosure. *See TUCO*, 960 S.W.2d at 636.[7]

Here, an investigation into the nature of the BP Products representation would have revealed that Gunn was working with several other attorneys in seeking a writ of mandamus to prevent the apex deposition of Lord Browne, CEO of BP Amoco p.l.c., the ultimate parent company of BP Products and the Amoco appellants. Appellants attempt to trivialize the importance of these facts by arguing Beck Redden did not represent BP Amoco p.l.c. or Lord Browne, and that Lord Browne retired from BP Amoco p.l.c. before the petition for writ of mandamus was resolved by the supreme court and before hearings began in the underlying arbitration. Nevertheless, the fact remains that Beck Redden was involved in preventing the deposition of the CEO of the ultimate parent company of the Amoco appellants contemporaneous to the time when the parties approved McDade as a member of the arbitration panel. Moreover, additional facts indicate the materiality of the BP Products representation:

- During the arbitration hearings, one of the lead negotiators for "BP Amoco" in the Altura transaction testified that a "strategic decision" was made to sell Altura and focus on more long-term assets. The same negotiator signed the closing documents for the transaction on behalf of "BP Amoco p.l.c." [8]

- In their briefing to the arbitration panel, appellants argued that the closing agreement affirmed that the PSA released Amoco from its indemnity obligations relative to environmental claims—the subject matter of the arbitration. In other words, appellants argued that the closing agreement in conjunction with the PSA supported their position in the arbitration.

- Another witness testified during the arbitration hearings that Lord Browne announced "he would dispose of these assets ... by the end of the year," apparently referring to Altura.

- A letter in which Oxy presented an offer for Altura was sent to the "Group Vice President of Mergers and Acquisitions" for "BP Amoco, p.l.c."

- Evidence presented during the arbitration showed that BP Amoco p.l.c. and appellee Occidental Permian Ltd. entered into an agreement on the same day that the closing agreement was signed whereby BP Amoco p.l.c. guaranteed a $1.135 billion loan that Occidental Permian Ltd. made to another BP entity.

Accordingly, an objective person could reasonably conclude that Beck Redden's participation in mandamus proceedings to prevent Lord Browne's deposition was a material nondisclosure because the arbitration proceedings were rife with evi-

---

7. In other words, an arbitrator cannot intentionally fail to determine whether information known to him is trivial or material and later claim, when accused of evident partiality, that he was unaware of the nature of the information. An arbitrator's failure to determine whether known information exhibits a conflict between the arbitrator and an arbitrating party may be evidence of the arbitrator's bias toward that party.

8. Oxy also argues it is significant that Eileen A. Kamerick signed the closing document on behalf of Amoco X.T., Amoco Y.T., *and* Amoco Oil Company, which later became BP Products. However, we disregard this fact because Oxy does not cite evidence reflecting McDade was, or should have been, aware that BP Products was formerly known as Amoco Oil Company.

dence of BP Amoco p.l.c.'s and Lord Browne's involvement in the Altura transaction.

## C. McDade's connection to the BP Products representation

Appellants further argue that the undisclosed BP Products representation did not support evident partiality because McDade had no involvement or financial interest in the matter. According to appellants, McDade was merely "of counsel" at Beck Redden and did not stand to benefit financially by favoring appellants. As noted above, the supreme court expressly rejected an invitation to hold that only an arbitrator's direct financial or business relationships may form the basis of his evident partiality. *TUCO*, 960 S.W.2d at 637 ("[P]arties should have access to all information that might reasonably affect the potential arbitrator's impartiality. This could obviously include, for example, a familial or close social relationship."). Further, even in an "of counsel" capacity, McDade has a business relationship with Beck Redden and its attorneys and was paid a salary by Beck Redden. It would not be unreasonable for a person to assume that appellants would be more inclined to continue to use Beck Redden's and McDade's services if appellants prevailed in the arbitration. In fact, it is undisputed that shortly after the panel issued its award, Shell designated McDade as an arbitrator in unrelated matter.

## D. Beck Redden's opposition to BP in a separate matter does not render the undisclosed BP Products representation immaterial

Appellants also contend that any impression of bias raised by Beck Redden's BP Products representation was neutralized by the fact that Beck Redden was at the same time representing a client in litigation *against* BP America Production Company—the direct parent of two of the Amoco appellants. However, whether Oxy would have found this fact significant is a question that should have been resolved by Oxy. *See id.* at 636 ("[Courts that consider whether undisclosed information establishes partiality have] needlessly involved themselves in evaluations of partiality that are better left to the parties."). For example, Oxy could have decided that the conflict stemming from Beck Redden's attempt to prevent the deposition of the CEO of the pinnacle BP/Amoco entity rendered McDade objectionable despite Beck Redden's adverse representation to BP America Production Company.

## E. Oxy does not have the burden to prove it would have objected to McDade if information had been disclosed

■■■■■ Finally, appellants contend the trial court erred by vacating the arbitration award because Oxy failed to present any evidence it would have objected to McDade if he had timely disclosed the BP Products representation. Appellants argue the record actually supports an inference Oxy would not have objected because (1) Oxy did not object when McDade disclosed that he represented wholly-owned subsidiaries of Shell approximately twenty-years ago and (2) the trial court expressed on the record that Oxy would not have objected had McDade made the disclosures. However, whether the party asserting evident partiality would have actually objected to the undisclosed information is not an element of the evident-partiality standard. "[E]vident partiality is established from the *nondisclosure itself*, regardless of whether the nondisclosed information necessarily establishes partiality or bias." *TUCO*, 960 S.W.2d at 636. In other words, evident partiality is established by an arbi-

trator's failure to disclose non-trivial information; whether earlier disclosure would have prompted a party to object is superfluous.[9]

## F. Application of *TUCO* standard to facts

 In sum, (1) BP Amoco p.l.c. and Lord Browne were involved in the transaction underlying the arbitrated dispute, (2) Beck Redden's representation of BP Products involved preventing the apex deposition of Lord Browne, CEO of BP Amoco p.l.c., and (3) even as "of counsel" to Beck Redden, McDade had a business interest in Beck Redden that could affect his partiality. We conclude that McDade's failure to disclose Beck Redden's BP Products representation might, to an objective observer, create a reasonable impression of his partiality. *See TUCO*, 960 S.W.2d at 636. We recognize that evident partiality is generally proved by an arbitrator's nondisclosure of *his own* potential conflicts,[10] whereas here, McDade's evident partiality was proved by his nondisclosure of his *firm's* potential conflicts. Nevertheless, the fact that a reasonable person could conclude the circumstances *might* have affected McDade's impartiality triggered his duty to disclose. *See id.* at 639. Thus, the fact that McDade failed to disclose non-trivial information was sufficient to establish evident partiality. *Id.* at 636. We need not consider whether Oxy's additional allegations establish McDade's evident partiality.

9. Additionally, requiring a party to prove it would have objected to the undisclosed information would likely require speculative and otherwise objectionable testimony.

10. *See, e.g., Commonwealth Coatings*, 393 U.S. at 146–50, 89 S.Ct. 337; *TUCO*, 960 S.W.2d at 637; *Falbaum*, 105 S.W.3d at 33; *J.D. Edwards*, 91 S.W.3d at 844; *Tex. Commerce*

Accordingly, we overrule the appellants' sole issue and affirm the trial court's judgment.

*Bank, N.A. v. Universal Technical Inst. of Tex., Inc.*, 985 S.W.2d 678, 681 (Tex.App.-Houston [1st Dist.] 1999, pet. dism'd w.o.j.). *But see Schmitz*, 20 F.3d at 1049 (determining arbitrator's failure to disclose his law firm's prior representation of a parent company of one of the parties established the arbitrator's evident partiality).