**Opinion issued July 24, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-13-00040-CV

_____

**FOREST OIL CORPORATION, Appellant**

**V.**

**EL RUCIO LAND AND CATTLE COMPANY, INC., SAN JACINTO LAND PARTNERSHIP, LTD., MCALLEN TRUST PARTNERSHIP, AND JAMES ARGYLE MCALLEN, Appellees**

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2005-23091**

---

## O P I N I O N

Forest Oil Corporation appeals the trial court's judgment confirming a final arbitration award rendered against it in favor of El Rucio Land and Cattle Company, Inc., San Jacinto Land Partnership, Ltd., McAllen Trust Partnership, and James Argyle McAllen. Identifying five issues, Forest Oil asserts that the trial court erred in granting the motion to confirm the arbitration award. In support of

its position, Forest Oil asserts that the Texas Railroad Commission had exclusive or primary jurisdiction over the dispute and contends that the arbitrators exceeded their authority in rendering the award. Forest Oil also avers that the award should be vacated based on evident partiality of one of the arbitrators. Finally, Forest Oil claims that the actual damages awarded by the arbitrators resulted from gross mistake or a manifest disregard for the law.

We affirm.

## Background Summary

The 27,289.5-acre McAllen Ranch ("the Ranch") lies in Hidalgo County, Texas. For many years, Forest Oil has held a mineral lease covering over 1,400 acres of the Ranch under which it has drilled for and produced natural gas. Forest Oil also operates a plant on the ranch, which processes the gas before it is placed in a pipeline for transport off the Ranch. The plant covers 5.75 acres.

In 2005, James Argyle McAllen, El Rucio Land and Cattle Company, Inc., San Jacinto Land Partnership, Ltd., and McAllen Trust Partnership (collectively, "the McAllens") initiated a suit against Forest Oil. Based on their ownership of the Ranch, the McAllens sought to recover for environmental damage caused to the property by Forest Oil's operations. The McAllens alleged that Forest Oil had deposited hazardous materials on the Ranch, contaminating its soil and ground water. Included in these materials were mercury-contaminated iron sponge wood

2

chips, a hazardous waste generated in the production of natural gas. The McAllens alleged that Forest Oil had improperly buried the mercury-contaminated waste at various locations on the Ranch. The McAllens also asserted that Forest Oil had improperly disposed of other hazardous materials on the property.

In addition, the McAllens claimed that Forest Oil had donated oilfield drilling pipe contaminated with naturally occurring radioactive material (commonly referred to as "NORM") for the construction of pens to hold endangered rhinoceroses. The rhinoceroses were housed at an animal sanctuary located on a nearby property also owned by the McAllens, the Santillana Ranch. Although it had originated from the gas production on the McAllen Ranch, the pipe had been moved to the Santillana Ranch for construction of the pens.

The McAllens alleged that James Argyle McAllen ("Mr. McAllen") had handled the NORM contaminated pipe in the construction of the rhinoceros pens. Mr. McAllen claimed that his exposure to the radioactive material had caused him to develop cancer in his leg, which ultimately necessitated the leg's amputation. The McAllens also alleged that the Ranch had been contaminated with radioactive waste.

Forest Oil moved to compel arbitration of the McAllens' environmental claims.[1] Forest Oil relied on an arbitration clause contained in a 1999 Settlement Agreement signed by Mr. McAllen in a separate lawsuit with Forest Oil from the 1990s. That suit involved a dispute over oil and gas royalties and leasehold development. The Settlement Agreement resolved the royalty and nondevelopment disputes, but the parties had expressly reserved the right to arbitrate, under the Texas General Arbitration Act, claims "for environmental liability, surface damages, personal injury, or wrongful death occurring at any time and relating to the McAllen Ranch Leases." The parties also incorporated a separate "Surface Agreement" into the Settlement Agreement. The Surface Agreement provided for the ongoing care and remediation of the surface estate by Forest Oil.

The McAllens opposed Forest Oil's motion to arbitrate their environmental claims. Mr. McAllen asserted that the arbitration provision in the Settlement Agreement was unenforceable because he had been induced to sign it by fraud. Ultimately, the dispute regarding the arbitration agreement was resolved by the

---

[1] The McAllens filed their suit in Hidalgo County. Forest Oil filed suit in Harris County requesting the Harris County court to order the parties to arbitration. Forest Oil pointed out that the arbitration clause required arbitration in Harris County. The McAllens counter-claimed in the Harris County suit, asserting the claims they had made in Hidalgo County. When the case was arbitrated, the parties were realigned so that the McAllens were the plaintiffs and Forest Oil was the defendant.

4

Supreme Court of Texas, which sided with Forest Oil. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 61 (Tex. 2008). The supreme court held that the arbitration clause in the Settlement Agreement was enforceable. *See id.* at 62. Thus, the McAllens were required to arbitrate their environmental claims against Forest Oil.

The case proceeded to arbitration. The arbitration clause required the dispute to be decided by a panel of three neutral arbitrators. Each side chose one arbitrator. Forest Oil selected Daryl Bristow, and the McAllens chose Donato Ramos. The trial court appointed the third arbitrator, Clayton Hoover.

At the time of arbitration, the McAllens' live pleading identified various tort claims against Forest Oil, including negligence, gross negligence, trespass, nuisance, and fraud. The McAllens sought actual damages for environmental contamination to their property caused by Forest Oil's operations. The McAllens also requested they be awarded exemplary damages against Forest Oil.

In addition, the McAllens asserted a breach of contract claim. The McAllens alleged that Forest Oil had failed to comply with provisions of the Surface Agreement, incorporated into the Settlement Agreement, addressing Forest Oil's obligations with respect to the remediation of the surface estate. Based on their breach of contract claim, the McAllens requested attorney's fees in addition to actual damages.

Mr. McAllen also alleged a claim for civil assault against Forest Oil for his exposure to radiation from the pipes donated by Forest Oil to construct the rhinoceros pens. He sought damages for personal injury and mental anguish.

The hearing before the Arbitration Panel lasted for 17 days. Ultimately, two of three arbitrators found in favor of the McAllens. The arbitrator selected by Forest Oil, B. Daryl Bristow, dissented to the award in a written opinion.

The Arbitration Award provided, in part, as follows:

FINDINGS OF THE PANEL

1. El Rucio Land and Cattle Company, Inc., San Juanito Land Partnership, Ltd., McAllen Trust Partnership, and James Argyle McAllen (collectively the "Claimants") are the owners in fee of certain ranchlands in Hidalgo County, Texas, known . . . as the McAllen Ranch.
2. Respondent Forest Oil Corporation leases mineral rights on approximately 3,000 acres of the McAllen Ranch; the Forest leases cover approximately 1,500 acres . . . .

3. Forest Oil Corporation built and still operates a natural gas plant on approximately 5.75 acres of the McAllen Ranch.

. . . .

DECISIONS OF THE PANEL

5. The Panel hereby Orders, Adjudges and Decrees that Claimants are the prevailing parties in this matter and that Claimants El Rucio Land and Cattle Company, Inc., San Juanita Land Partnership, Ltd., and McAllen Trust Partnership are entitled to actual damages in the amount of $15,000,000 collectively. The Panel further hereby Orders, Adjudges and Decrees that Mr. James Argyle McAllen, Individually, is entitled to actual damages of $500,000.

6

6. The Panel hereby Orders, Adjudges and Decrees that Claimants have met their burden of proof as required by law for their claims of exemplary damages and hereby awards exemplary damages to Claimants in the total amount of $500,000.

7. The Panel hereby Orders, Adjudges and Decrees that Claimants are entitled to declaratory relief as requested regarding their rights and Forest Oil's obligations to Claimants under the 1999 Surface Agreement and hereby Orders, Adjudges and Decrees that:

> a. Forest Oil has a continuing obligation and duty under the Surface Agreement to locate, remediate and dispose of all hazardous and non-hazardous materials from the McAllen Ranch related to Forest Oil's operations;
>
> b. Forest Oil is required to perform remedial work where the need therefore arises, which shall include the removal of any and all hazardous and non-hazardous materials when those materials are no longer necessary in the conduct of Forest Oil's operations on the lease;
>
> c. Forest Oil is solely responsible for reimbursing Claimants for any future costs and expenses incurred by Claimants in conducting investigations which result in the identification of additional locations requiring remediation of hazardous and non-hazardous materials on the McAllen Ranch resulting from Forest Oil's operations; and
>
> d. Forest Oil is solely responsible for all future remediation costs and activities related to pollutants, contaminants, and hazardous and non-hazardous materials that are known to be present and/or discovered under those lands covered by the Surface Agreement.

The arbitrators also awarded the McAllens attorney's fees totaling $5,017,374.

The Arbitration Award required Forest Oil to post a $10,000,000 bond.

7

In his dissent to the Award, Arbitrator Bristow criticized the panel majority for not specifying the basis for the damages awarded. He also opined that the majority's decision interfered with the jurisdiction of the Texas Railroad Commission ("Railroad Commission"), which regulates the remediation of hazardous waste associated with oil and gas production in Texas. Bristow stated that this interference violated not only the law but also violated public policy.

Bristow pointed out that Mr. McAllen had requested the Railroad Commission to investigate Forest Oil in 2007. Bristow pointed out that the Railroad Commission had placed Forest Oil in its Operator Cleanup Program. He noted that the Railroad Commission's oversight of the remediation at McAllen Ranch was ongoing and that a final agency determination regarding remediation at the Ranch had yet to be made. Bristow averred that the arbitration panel should have abated the arbitration until the Railroad Commission had made a final determination regarding remediation of the property.

Bristow also opined that the evidence offered at the arbitration hearing did not support the damages awarded. And he also criticized the panel majority for interpreting the Surface Agreement to include obligations that he stated the agreement did not require.

The McAllens filed a motion to confirm the Award in the trial court. Forest Oil filed a motion to vacate the Award. In its motion, Forest Oil included many of

8

the same arguments for vacatur that were raised by Arbitrator Bristow in his dissent. Forest Oil also asserted that the award should be vacated because of the evident partiality of Arbitrator Ramos, who had been selected by the McAllens.

Following a hearing, the trial court denied Forest Oil's motion to vacate the Arbitration Award, with one exception. The court vacated the Award's $10,000,000 bond requirement. The trial court signed an order detailing the basis for its decision to deny the motion to vacate.

Confirming the Award, the trial court signed a final judgment incorporating the actual and exemplary damages awarded by the Arbitration Panel and incorporated the Panel's declarations regarding the Surface Agreement. The trial court also awarded the McAllens $6,781,802 in attorney's fees.

Forest Oil now appeals the judgment. Identifying five primary issues, Forest Oil asserts that the trial court erred by denying its motion to vacate the Arbitration Award. Forest Oil cites the following reasons for reversal of the trial court's judgment confirming the Award: the Railroad Commission had exclusive or primary jurisdiction over the dispute; the arbitrator selected by the McAllens exhibited evident partiality; the arbitrators exceeded the scope of their authority; the actual damages awarded by the arbitrators resulted from gross mistake or a manifest disregard for the law; and the exemplary damages award violated the contractual limits on the arbitrators' authority.

9

## Exclusive and Primary Jurisdiction

In its second issue, Forest Oil asserts that the Award should be vacated because it interferes with the exclusive, or alternatively, the primary jurisdiction of the Railroad Commission.

## A. Legal Principles

Texas courts have often confused the primary jurisdiction and exclusive jurisdiction doctrines, which are distinctly different doctrines that have different consequences when applied. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 220 (Tex. 2002). Despite similar terminology, primary jurisdiction is prudential whereas exclusive jurisdiction is jurisdictional. *Id.* Thus, if the Railroad Commission had exclusive jurisdiction, as Forest Oil asserts, not only would the Arbitration Panel have lacked subject-matter jurisdiction to make the Award, but the trial court would have lacked jurisdiction to render judgment on the Award against Forest Oil. *See Kansas City S. v. Port of Corpus Christi Auth.*, 305 S.W.3d 296, 303 (Tex. App.—Corpus Christi 2009, pet. denied).

Whether the legislature has vested exclusive jurisdiction in an agency is determined by examination and construction of the relevant statutory scheme. *Subaru*, 84 S.W.3d at 221. We look to whether the legislature has enacted express statutory language indicating that the agency has exclusive jurisdiction or, if not, whether a "pervasive regulatory scheme" nonetheless reflects legislative intent that

an agency have the sole power to make the initial determination in the dispute. *See id.* Whether an agency has exclusive jurisdiction depends on statutory interpretation. *See id.*

The judicially-created primary jurisdiction doctrine operates to allocate power between courts and agencies when both have authority to make initial determinations in a dispute. *Id.* at 221. Trial courts should employ the primary jurisdiction doctrine to allow an agency to initially decide an issue when "(1) an agency is typically staffed with experts trained in handling the complex problems in the agency's purview; and (2) great benefit is derived from an agency's uniformly interpreting its laws, rules, and regulations, whereas courts and juries may reach different results under similar fact situations." *Id.*

Determining if an agency has exclusive or primary jurisdiction requires statutory construction. *Id.* at 222. Because it is a question of law, a court reviews de novo whether an agency has exclusive or primary jurisdiction. *Id.* Our purpose in construing a statute is to determine the legislature's intent. *See Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001).

## B.  Analysis

### 1.  *Exclusive Jurisdiction*

The Arbitration Award indicates that the McAllens requested the Arbitration Panel to declare the McAllens' rights and Forest Oil's obligations under the 1999 Surface Agreement.[2]  In this regard, the Panel made the following award:

> 7. The Panel hereby Orders, Adjudges and Decrees that [the McAllens] are entitled to declaratory relief as requested regarding their rights and Forest Oil's obligations to [the McAllens] under the 1999 Surface Agreement and hereby Orders, Adjudges and Decrees that:
>
> > a. Forest Oil has a continuing obligation and duty under the Surface Agreement to locate, remediate and dispose of all hazardous and non-hazardous materials from the McAllen Ranch related to Forest Oil's operations;
> >
> > b. Forest Oil is required to perform remedial work where the need therefore arises, which shall include the removal of any and all hazardous and non-hazardous materials when those materials are no longer necessary in the conduct of Forest Oil's operations on the lease;
> >
> > c. Forest Oil is solely responsible for reimbursing Claimants for any future costs and expenses incurred by [the McAllens] in conducting investigations which result in the identification of additional locations requiring remediation of hazardous and non-hazardous materials on the McAllen Ranch resulting from Forest Oil's operations; and

---

[2]  The Award indicates that the McAllens made a request for declaratory relief; however, such request is not contained in the McAllens' live pleading found in the record.

d. Forest Oil is solely responsible for all future remediation costs and activities related to pollutants, contaminants, and hazardous and non-hazardous materials that are known to be present and/or discovered under those lands covered by the Surface Agreement.

These declarations implicate the following provisions of the Surface Agreement:

4. At the time any well, regardless of when drilled, is plugged or abandoned, or has been plugged or abandoned prior to the date of the Settlement Agreement, the Lessees owning an interest in each such well agree to remove the caliche, and other pad site materials and restore to as near its original condition as is reasonably practicable, the pad site, and access roads that are not used for other producing wells, as follows:

(a) All non-natural materials shall be removed and planted with buffel grass, bermuda grass or commonly available other grass . . . .

(b) Grade the sites to their original level.

(c) Remove all broken or discarded material, machinery, trash and debris.

(d) Rake and bum all removed brush.

(e) [Remove rocks.]

5. . . . All drilling mud and other foreign materials shall be removed from the premises upon the establishment of the permanent pad site. Any oil based drilling mud used must be in a container and not stored on the surface. . . .

. . . .

8. Lessees [including Forest Oil] will not bring on the Leases any hazardous material . . . . Further Lessees agree (1) to remove from the Leases, if, as and when required by law, any hazardous material

13

placed or released thereon by Lessees, (2) to perform remedial work where the need therefore arises as a result of and is caused by Lessees' operations or activities on the Leases, and (3) to comply in all respects with all federal, state and local governmental laws and regulations governing operations by Lessees and remedial work on or associated with the Leases.

Forest Oil complains that the Arbitration Panel's declarations impermissibly invade the Railroad Commission's exclusive jurisdiction to develop and to enforce remediation requirements associated with Forest Oil's gas operations on the McAllen Ranch. Forest Oil points to the language in paragraph 8 of the Surface Agreement, which states that Forest Oil will "remove from the Leases, if, as and when required by law, any hazardous material placed or released thereon by [Forest Oil]." Forest Oil asserts that the Railroad Commission's regulations are the only "law" that applies to the cleanup of the contamination alleged in this case.

In support of its position, Forest Oil cites Water Code section 26.131, which provides, "The Railroad Commission of Texas is solely responsible for the control and disposition of waste and the abatement and prevention of pollution of surface and subsurface water resulting from . . . activities associated with the exploration, development, and production of oil or gas or geothermal resources . . . ." TEX. WATER CODE ANN. § 26.131(a)(1) (Vernon 2008). Forest Oil points to the "solely responsible" language in the statute. Forest Oil asserts this language shows that the Legislature intended the Railroad Commission to have exclusive jurisdiction to

address environmental contamination resulting from oil and gas production, which affects the State's water.

Forest Oil also cites additional statutory provisions empowering the Railroad Commission with broad authority to regulate and to oversee the remediation of wastes associated with oil and gas operations. *See, e.g.,* TEX. NAT. RES. CODE ANN. § 91.101 (Vernon 2011) (directing Railroad Commission to adopt and enforce rules and issue permits relating to "the discharge, storage, handling, transportation, reclamation, or disposal" of oil and gas waste or any other substance or material associated with oil and gas operations); TEX. HEALTH & SAFETY CODE ANN. § 401.415 (Vernon 2010) (providing Railroad Commission sole authority to regulate and issue licenses, permits, and orders for the disposal of oil and gas NORM waste). And Forest Oil points to the extensive regulatory scheme promulgated by the Railroad Commission to address environmental contamination associated with oil and gas operations. *See, e.g.,* 16 TEX. ADMIN. CODE §§ 4.201–4.635 (2014) (Tex. R.R. Comm'n rules regulating environmental issues associated with oil and gas production).

We agree that the Texas Legislature has chosen the Railroad Commission as the state agency that solely makes and enforces environmental regulations related to oilfield operations vis à vis other state administrative agencies. *See* TEX. WATER CODE ANN. § 26.131(a)(1); TEX. HEALTH & SAFETY CODE ANN. § 401.415; *see*

15

*also In re Apache Corp.*, 61 S.W.3d 432, 434–35 (Tex. App.—Amarillo 2001, orig. proceeding) (concluding that "solely responsible" language in Water Code section 26.131 indicates legislative intent that Railroad Commission, not another agency, has regulatory authority over abatement and prevention of pollution of surface and ground water resulting from oilfield activities) (citing *Jackson Cnty. Vacuum Truck, Inc. v. Lavada–Navidad River Auth.*, 701 S.W.2d 12, 14 (Tex. App.—Corpus Christi 1985, no writ) (explaining that legislative intent behind Water Code section 26.131 was to resolve jurisdictional disputes between Railroad Commission and Department of Water Resources)).

We also agree that the Legislature enabled the Railroad Commission to develop a pervasive regulatory scheme by which the agency oversees environmental issues incident to oil and gas production in Texas and under which it enforces its rules. However, we are mindful that, because "[a]brogating common-law claims is disfavored" in light of open courts implications, we are not to construe a statute creating an administrative remedy to deprive a person of an established common-law remedy unless the statute "clearly or plainly" reflects the legislature's intent to supplant the common-law remedy with the statutory one. *Cash Am. Int'l, Inc. v. Bennett*, 35 S.W.3d 12, 15–17 (Tex. 2000); *see Emps. Ret. Sys. of Tex. v. Duenez*, 288 S.W.3d 905, 910 (Tex. 2009) ("[W]e must avoid constitutionally suspect constructions [of a statute]. Relegating common-law

16

claims to administrative remedies implicates the Texas Constitution's open-courts provision.")

Here, none of the statutes cited by Forest Oil clearly or plainly indicate that the Legislature intended the Railroad Commission's regulatory scheme to abrogate or to supplant a landowners' right to obtain common-law relief for injuries caused to his property by environmental contamination. *Cf. Subaru*, 84 S.W.3d at 223 (holding statute clearly and expressly stated that agency had "exclusive, original jurisdiction" over disputes). Nothing in the statutory scheme prohibits a landowner from suing a polluter under established common-law causes of action, such as nuisance and trespass, to obtain established common-law remedies. *See Manchester Terminal Corp. v. Tex. TX TX Marine Transp., Inc.*, 781 S.W.2d 646, 650 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (recognizing that nuisance and trespass are well-recognized common-law remedies to address pollution). The statutes also do not provide the Railroad Commission with authority to grant a remedy for wrongs that arise under the common law. Determining that the Railroad Commission has exclusive jurisdiction to address property damage caused by oilfield operations through the agency's regulatory authority would foreclose a landowner's redress for injury to his property for which he is entitled under the common law. Unless otherwise stated by law, a landowner can seek redress for pollution to his property even when the polluter is regulatory compliant. *See, e.g.,*

17

*id.* (holding that air polluter could be subject to damages and injunctive relief under common-law causes of action despite being in compliance with air emission permit issued by regulatory authority).

The common law of contract could also require a polluter to remove hazardous waste from a landowner's property. A landowner could—as in this case—contract with a potential polluter to require the polluter to remediate the property in the event of environmental contamination. Here, Forest Oil agreed in the Surface Agreement "to perform remedial work where the need therefore arises as a result of and is caused by Lessees' operations or activities on the Leases." The parties could not validly contract to violate the Railroad Commission's rules; however, the law does not prohibit an agreement to a remediate that is coterminous with, or greater than, that required by the agency. In the event of a dispute, a party could seek to have the contract enforced or, as here, seek to have a tribunal determine the parties' rights and obligations under the agreement.

In addition to the common-law claims, section 85.321 of the Natural Resources Code provides for a private cause of action for damages based on a violation of Texas conservation laws or of a Railroad Commission rule or order.[3]

---

[3]    Section 85.321 reads,

A party who owns an interest in property or production that may be damaged by another party violating the provisions of this chapter, . . . or another law of this state prohibiting waste or a valid rule or order of the

*See* TEX. NAT. RES. CODE ANN. § 85.321 (Vernon 2011); *Exxon Corp. v. Emerald Oil & Gas Co.*, 331 S.W.3d 419, 422 (Tex. 2010).  The next provision in the act—Natural Resources Code section 85.322, entitled, "Proceedings Not to Impair Suit for Damages"—further provides,

> None of the provisions of this chapter . . ., no suit by or against the commission, and no penalties imposed on or claimed against any party violating a law, rule, or order of the commission shall impair or abridge or delay a cause of action for damages or other relief that an owner of land or a producer of oil or gas, or any other party at interest, may have or assert against any party violating any rule or order of the commission or any judgment under this chapter.

TEX. NAT. RES. CODE ANN. § 85.322.  In its reply brief, Forest Oil asserts that sections 85.321 and 85.322 limit a property owner to a suit only for violations of a Railroad Commission rule or order.  We disagree.

Reading the plain language of these provisions shows that they are intended to provide a property owner, or other qualified party, with an additional remedy. There is no plain or clear language in these provisions that this statutory remedy

---

> commission may sue for and recover damages and have any other relief to which he may be entitled at law or in equity.  Provided, however, that in any action brought under this section or otherwise, alleging waste to have been caused by an act or omission of a lease owner or operator, it shall be a defense that the lease owner or operator was acting as a reasonably prudent operator would act under the same or similar facts and circumstances.

TEX. NAT. RES. CODE ANN. § 85.321 (Vernon 2011).

19

for damages was intended by the Legislature to supplant a property owner's right to an established common-law remedy.

In sum, there is law, besides the Railroad Commission's regulations, under which a property owner may seek redress for environmental contamination. We conclude that neither the language of the pertinent statutes nor the Railroad Commission's extensive regulatory scheme show a legislative intent indicating that the Railroad Commission has exclusive jurisdiction to fashion a remedy for non-regulatory based claims, such as those in this suit. *See Subaru*, 84 S.W.3d at 223.

### 2. *Primary Jurisdiction*

Alternatively, Forest Oil claims that the Railroad Commission has primary jurisdiction in this dispute. To reiterate, primary jurisdiction is a judicially-created doctrine, which operates to allocate power between courts and agencies when both have authority to make initial determinations in a dispute. *Subaru*, 84 S.W.3d at 221. Trial courts should employ the primary jurisdiction doctrine to allow an agency to initially decide an issue when "(1) an agency is typically staffed with experts trained in handling the complex problems in the agency's purview; and (2) great benefit is derived from an agency's uniformly interpreting its laws, rules, and regulations, whereas courts and juries may reach different results under similar fact situations." *Id.*

Forest Oil points out that the Railroad Commission has been investigating the environmental contamination at the McAllen Ranch since 2007, and Forest Oil has been in the agency's voluntary cleanup program since that time. Forest Oil also points out that it has submitted its final remediation plan to the Railroad Commission for approval. Forest Oil states that, although the Railroad Commission has approved substantial portions of its proposals, Forest Oil awaits the agency's final approval of its plan.

Forest Oil asserts that the Railroad Commission "has decided—or ultimately will decide—the same issues the McAllens complained about in arbitration." Forest Oil avers that factual determinations regarding the following issues have been made or will be made by the Railroad Commission, which were also raised during arbitration: (1) whether the pipe Forest Oil donated to the McAllens for the construction of the rhinoceros pens was contaminated with NORM; (2) whether Forest Oil buried mercury-contaminated iron sponge on the Ranch; (3) whether Forest Oil contaminated the groundwater with chlorides, arsenic, and other hazardous chemicals; and (4) whether Forest Oil buried three drums of radioactive waste on the Ranch. Forest Oil asserts that these determinations are best made by the Railroad Commission's experts, who have been involved with the regulatory compliance issues at the Ranch.

Here, the causes of action presented and the relief pursued by the McAllens in the arbitration did not derive from Forest Oil's non-compliance with Railroad Commission rules and regulations. Rather, the McAllens pursued common-law claims and declaratory relief, which are not dependent on the standards of regulatory compliance.[4] Thus, the claims do not require the agency's regulatory or administrative expertise or an interpretation of the Railroad Commission's rules or regulations.

In addition, the McAllens' damage claims were not based only on the present status of the environmental contamination but also on contamination that they claimed has been remediated or removed. The McAllens also asserted a fraud claim, premised on alleged misrepresentations made by Forest Oil regarding environmental contamination on the Ranch.

While determining Forest Oil's compliance with regulatory standards is a complex problem within the agency's purview, making factual determinations to determine whether a party is entitled to a common-law remedy or to declaratory relief is not. Simply because the Railroad Commission might have jurisdiction to determine some facts related to a controversy does not oust a court, or in this case,

---

[4] The McAllens did allege a claim for negligence per se in their live pleading, asserting violations of various statutes and Railroad Commission regulations. However, neither the briefing nor the record presented indicates that this was the McAllens' theory of recovery during the arbitration.

the arbitrators, of jurisdiction to make the underlying factual determinations.[5] *See*

*Amarillo Oil Co. v. Energy–Agri Prods., Inc.,* 794 S.W.2d 20, 26 (Tex. 1990). We

conclude that the Railroad Commission did not have primary jurisdiction as

asserted by Forest Oil.[6]

---

[5] We note that the McAllens' common-law claims and declaratory relief are inherently judicial in nature. *See, e.g., In re Cano Petroleum, Inc*., 277 S.W.3d 470, 473–74 (Tex. App.—Amarillo 2009, orig. proceeding) (holding that award of damages in negligence action is routinely heard and decided by trial courts and must be considered inherently judicial in nature); *Mitz v. Tex. State Bd. of Veterinary Med. Exam'rs,* 278 S.W.3d 17, 24 (Tex. App.—Austin 2008, pet. dism'd) (determining claim under Uniform Declaratory Judgment Act was inherently judicial); *Manchester*, 781 S.W.2d at 650 (recognizing trespass and nuisance claims are inherently judicial in nature). The Supreme Court of Texas has held, "'[W]hen an action is inherently judicial in nature, the courts retain jurisdiction to determine the controversy unless the legislature by valid statute has expressly granted exclusive jurisdiction to the administrative body.'" *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline–Texas, LLC*, 363 S.W.3d 192, 199 (Tex. 2012) (quoting *Amarillo Oil Co. v. Energy–Agri Prods., Inc.*, 794 S.W.2d 20, 26 (Tex. 1990)). As discussed, the Legislature did not expressly grant exclusive jurisdiction to the Railroad Commission with respect to this matter.

[6] In conjunction with its primary-jurisdiction argument, Forest Oil generally asserts that the Arbitration Award was an impermissible collateral attack on findings made by the Railroad Commission during its regulatory investigation and enforcement. Forest Oil avers that the arbitrators' damages award was based on implicit findings that are contrary to findings made by the Railroad Commission. However, we do not know the basis of the monetary damages awarded by the Arbitration Panel. We cannot presume the Award is an impermissible collateral attack on the agency's finding. To the contrary, we must indulge all reasonable presumptions in favor of the Award, and none against it. *See CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002). Moreover, as discussed, the McAllens' claims, including its request for declaratory relief, were inherently judicial in nature and were not matters that could be determined by the Railroad Commission. *See Amarillo Oil*, 794 S.W.2d at 25–26 (rejecting argument that party's judicial action for trespass was impermissible collateral attack on Railroad Commission's findings). Thus, we cannot conclude that the Arbitration Award was an impermissible collateral attack on the Railroad Commission's findings.

## C.    Public Policy

As part of its second issue, Forest Oil also asserts that the Arbitration Award "violates the clearly articulated and fundamental public policy that the [Railroad Commission] be solely responsible for the control, disposition, and abatement of wastes and pollution resulting from oil and gas production."  The Supreme Court of Texas has held that "an arbitration award cannot be set aside on public policy grounds except in an extraordinary case in which the award clearly violates carefully articulated, fundamental policy."  *CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 239 (Tex. 2002).

Forest Oil asserts that the Arbitration Panel should not have issued the declarations in the Award defining the parties' rights and obligations under the Surface Agreement when the Panel knew that the Railroad Commission was "actively overseeing" Forest Oil's remediation.  Forest Oil's public policy argument is generally premised on its assertion that the Panel's issuance of the Award violated the Railroad Commission's exclusive or primary jurisdiction.  As discussed, this assertion is without merit.  The Railroad Commission did not have exclusive or primary jurisdiction to remedy the environmental contamination. Thus, Forest Oil's public policy argument fails.

In addition, Forest Oil criticizes the content of the declarations rendered by the Panel.  It asserts that the declarations are akin to an order to remediate the

24

Ranch. Forest Oil complains that the declarations interfere with the Railroad Commission's pending remediation plan. At the same time, Forest Oil also criticizes the declarations because they do not define more specifically how remediation should be conducted on the property. It avers that, as a result, further litigation may be required to define the terms of the remediation. However, the declarations do not order Forest Oil to immediately begin remediation. Rather, the declarations serve to define the rights and obligations of the parties under the Surface Agreement.

The purpose of a declaratory judgment is to determine the parties' rights when a controversy has arisen but before a wrong has been committed; it is "preventative in nature." *Etan Indus. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011) (citing *Cobb v. Harrington*, 190 S.W.2d 709, 713 (Tex. 1945) (describing Uniform Declaratory Judgment Act as instrumentality wielded "in the interest of preventative justice," and intended as a remedy "when a real controversy has arisen and even before the wrong has actually been committed")). "The Declaratory Judgments Act does not permit a court to pass on hypothetical or contingent situations, or to determine questions not then essential to the resolution of an actual controversy, *even though such questions may in the future require adjudication*." *Peacock v. Schroeder*, 846 S.W.2d 905, 912 (Tex. App.—San Antonio 1993, no pet.) (emphasis added); *see also Empire Life Ins. Co. of Am. v. Moody*, 584 S.W.2d

25

855, 858 (Tex. 1979). A declaratory action need not concern a present lawsuit but may include "threatened litigation in the immediate future that seems unavoidable." *Monk v. Pomberg*, 263 S.W.3d 199, 207 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Peacock*, 846 S.W.2d at 912). Thus, Forest Oil has not shown that the declarations made by the Arbitration Panel violate public policy.

We overrule Forest Oil's second issue.

## Judicial Review of Arbitration Award

In its remaining four issues, Forest Oil asserts that the trial court should have vacated the Award based on grounds listed in the Texas General Arbitration Act ("TAA") and based on common-law grounds.

### A. Scope and Standard of Review

Texas law favors the arbitration of disputes. *Jones v. Brelsford*, 390 S.W.3d 486, 491–92 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *E. Tex. Salt Water Disposal Co. v. Werline*, 307 S.W.3d 267, 271 (Tex. 2010); *Brazoria Cnty. v. Knutson*, 176 S.W.2d 740, 743 (Tex. 1943)). As a result, judicial review of an arbitration award is extraordinarily narrow. *Id.* at 492 (citing *Women's Reg'l Healthcare, P.A. v. FemPartners of N. Tex., Inc.*, 175 S.W.3d 365, 367–68 (Tex. App.—Houston [1st Dist.] 2005, no pet.)). The review focuses on the integrity of the process, not the propriety of the result. *Id.*

We review a trial court's decision to confirm or to vacate an arbitration award de novo. *Port Arthur Steam Energy LP v. Oxbow Calcining LLC*, 416 S.W.3d 708, 712 (Tex. App.—Houston [1st Dist.] 2013, pet. filed) (citing *In re Chestnut Energy Partners, Inc.*, 300 S.W.3d 386, 397 (Tex. App.—Dallas 2009, pet. denied)). We examine the entire record in making such review. *Ouzenne v. Haynes*, No. 01–10–00112–CV, 2012 WL 1249420, at *1 (Tex. App.—Houston [1st Dist.] Apr. 12, 2012, pet. denied) (mem. op.).

Every reasonable presumption must be indulged to uphold the arbitrator's decision, and none is indulged against it. *CVN Group*, 95 S.W.3d at 245; *New Med. Horizons II, Ltd. v. Jacobson*, 317 S.W.3d 421, 428 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Review of an arbitration award is so limited that even a mistake of fact or law by the arbitrator is not a proper ground for vacating an award. *Universal Computer Sys., Inc. v. Dealer Solutions, L.L.C.*, 183 S.W.3d 741, 752 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

Pursuant to the TAA, on application by a party, the trial court "shall" confirm an arbitration award "[u]nless grounds are offered for vacating, modifying, or correcting an award under Section 171.088 or 171.091."[7] TEX. CIV. PRAC. &

---

[7]    The arbitration clause in the Surface Agreement states that the Texas General Arbitration Act governs arbitration, and the parties agree that the TAA governs this case. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 171.001–.098 (Vernon 2011).

27

REM. CODE ANN. § 171.087 (Vernon 2011). Relevant to this appeal, the TAA provides that a trial court shall vacate an arbitration award on a showing that "the rights of a party were prejudiced by . . . evident partiality by an arbitrator appointed as a neutral arbitrator" or "the arbitrators . . . exceeded their powers [or] . . . refused to postpone the hearing after a showing of sufficient cause for the postponement." TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(2)(A), (3)(A), (B). Texas courts have also analyzed whether an arbitration award should be vacated based on common-law grounds.[8] *See, e.g., Callahan & Assocs. v. Orangefield Indep. Sch. Dist.*, 92 S.W.3d 841, 844 (Tex. 2002) (presuming for sake of argument that common-law ground of gross mistake could be used to vacate award under TAA but holding that legal standard for gross mistake was not met).

## A. Stay of Arbitration

In its third issue, Forest Oil asserts that the Award should be vacated because it proved that a stay of the Arbitration was required. The TAA provides

---

[8] The United States Supreme Court has held that the statutory grounds provided in Federal Arbitration Act sections 10 and 11 for vacating, modifying, or correcting an arbitration award are the exclusive grounds for vacating an arbitration award. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584, 128 S. Ct. 1396, 1403, (2008). In contrast, the Supreme Court of Texas has reserved opinion regarding the continued viability of common law grounds for attacking an arbitration award under the TAA. *See E. Tex. Salt Water Disposal Co. v. Werline*, 307 S.W.3d 267, 270 n.7 (Tex. 2010) ("We express no opinion on this issue [of whether an arbitration under the TAA can be set aside on common law grounds.]").

that "the court shall vacate an award if . . . the arbitrators . . . refused to postpone the hearing after a showing of sufficient cause for the postponement." TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(3)(B). To determine what constitutes a "sufficient cause for postponement" under section 171.088(a)(3)(B), courts have examined the grounds a court would find sufficient to support a motion for continuance in a trial court. *See, e.g., In re Guardianship of Cantu de Villarreal*, 330 S.W.3d 11, 26 (Tex. App.—Corpus Christi 2010, no pet.); *Hoggett v. Zimmerman*, 63 S.W.3d 807, 811 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

Forest Oil asserts that the arbitrators should have stayed the arbitration pending final approval of its proposed remediation plan by the Railroad Commission. In support of this issue, Forest Oil relies on the arguments it presented in support of its point asserting that the Award violated the Railroad Commission's jurisdiction and violated public policy. Because we have found Forest Oil's jurisdictional and public policy arguments to be without merit, we also conclude the instant point is unmeritorious.

We overrule Forest Oil's third issue.

## B.    Evident Partiality of Arbitrator

In its first issue, Forest Oil asserts that the trial court erred by denying its motion to vacate, and in confirming the Award, because of the evident partiality of the arbitrator chosen by the McAllens, Donato Ramos. In particular, Forest Oil

asserts that Ramos's failure to disclose certain information to Forest Oil created an impression of evident partiality.

### 1. *Governing Legal Principles*

Pursuant to the TAA, a court shall vacate an award if the rights of the party were prejudiced by evident partiality of an arbitrator appointed as a neutral arbitrator. TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(2)(A). "An arbitrator's failure to disclose known facts that 'might, to an objective observer, create a reasonable impression of the arbitrator's partiality' can support vacatur of an arbitration decision." *Port Arthur Steam Energy*, 416 S.W.3d at 713–14 (citing *Mariner Fin. Group v. Bossley*, 79 S.W.3d 30, 32 (Tex. 2002) (quoting *Burlington N. R.R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 630 (Tex. 1997)).

"[E]vident partiality is established from the nondisclosure itself, regardless of whether the nondisclosed information necessarily establishes partiality or bias." *TUCO*, 960 S.W.2d at 636. This standard reflects the supreme court's determination that courts should not undertake evaluations of partiality that are better left to the parties. *Skidmore Energy, Inc. v. Maxus (U.S.) Exploration Co.*, 345 S.W.3d 672, 678 (Tex. App.—Dallas 2011, pet. denied) (citing *TUCO*, 960 S.W.2d at 636). "When choosing a neutral arbitrator, the parties must weigh the competing factors of the arbitrator's knowledge and experience against his potential conflicts; parties can only perform that analysis if they have access to all

30

of the information that could reasonably affect the arbitrator's partiality." *Id.* After disclosure is made, the parties can make their determination concerning potential bias before the arbitration begins, a process that is more desirable than a court making the determination after an award is in place. *Id.* "While a neutral arbitrator need not disclose relationships or connections that are trivial, the conscientious arbitrator should err in favor of disclosure." *Id.*

An evident partiality inquiry is a fact-intensive one, but the judiciary's involvement in assessing these facts is limited. *Port Arthur Steam Energy*, 416 S.W.3d at 712 (citing *Mariner Fin. Group v. Bossley*, 79 S.W.3d 30, 34 (Tex. 2002)). "'The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality.'" *Id.* (quoting *Commw. Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 151, 89 S. Ct. 337, 340 (1968)). Under both the Federal Arbitration Act and the Texas General Arbitration Act, the party seeking to vacate an arbitration decision based on evident partiality bears the burden of proof. *Id.* (citing *Amoco D.T. Co. v. Occidental Petroleum Corp.*, 343 S.W.3d 837, 841 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)).

As stated, an appellate court reviews de novo a trial court's decision regarding vacatur or confirmation of an arbitration award. *Id.* at 713. However, "when a trial court undertakes to resolve fact disputes in the context of a claim of evident partiality or misconduct, the trial court's fact findings must be reviewed for

31

legal and factual sufficiency while its legal conclusions will be reviewed de novo."
*Swonke v. Swonke*, No. 01–09–00059–CV, 2011 WL 1584809, at *4 (Tex. App.—Houston [1st Dist.] Apr. 21, 2011, no pet.) (mem. op.) (quoting *Las Palmas Med. Ctr. v. Moore*, No. 08–09–00226–CV, 2010 WL 3896501, at *7 (Tex. App.—El Paso Oct. 6, 2010, pet. ref'd) (mem. op.)); *see Port Arthur Steam Energy*, 416 S.W.3d at 713; *Amoco DT*, 343 S.W.3d at 844.

### 2.    *Analysis*

Forest Oil complains that Arbitrator Donato Ramos failed to disclose a relationship that he had with the McAllens in a related litigation. The related litigation was a suit filed by Willis Management, an entity affiliated with the McAllens. The suit was against Chevron USA, Inc. and was filed in Hidalgo County. The suit involved alleged surface damage to the McAllens' Santillana Ranch, which neighbors the McAllen Ranch. Some of the claims asserted by the McAllens in this suit also arise from activities occurring on the Santillana Ranch.[9]

Willis Management was represented in the Santillana litigation by Jon Christian Amberson and Rolando Cantu. Amberson represents the McAllens' in this litigation. Forest Oil asserts that Cantu has also represented the McAllens in

---

[9]    For example, the rhinoceros pens built with Forest Oil's donated pipe, which the McAllens claimed were contaminated with NORM, were located on the Santillana Ranch.

this suit. David Oliveira represented defendant Chevron in the Santillana litigation.

On January 7, 2009, Oliveira, filed a letter with the trial court, in the Santillana litigation, stating that the parties had agreed that Donato Ramos would mediate that case on February 18, 2009. The letter reflects that the McAllens' counsel, Amberson and Cantu, were copied on the letter. Oliveira's legal assistant also sent a letter to Amberson and to Cantu on January 13, 2009, informing them that Ramos was available to mediate the Santillana litigation on February 10 and 11, 2009.

When he saw the January 9, 2009 letter, Cantu called Amberson to ask him whether he had agreed that Ramos would mediate the Santillana litigation. Amberson told Cantu, "Absolutely not." Cantu then contacted Oliveira and told him that Ramos could not be the mediator in the Santillana litigation due to a conflict, the conflict being that Ramos was being considered as an arbitrator in this case. Another mediator was then chosen to mediate the Santillana litigation.

Amberson sent a letter to Forest Oil's counsel in this litigation on January 16, 2009, notifying it that the McAllens had selected Ramos as a neutral arbitrator in this case. The letter also disclosed that, eight years earlier, Amberson had represented clients who had retained Ramos as an expert witness on attorney's fees in two other cases.

Amberson also sent a letter to Forest Oil on February 18, 2009. The letter disclosed past associations between Ramos and other attorneys at the firm representing the McAllens.

After the Arbitration Award was rendered in this case in February 2011, Forest Oil learned that Ramos had been considered as a mediator in the Santillana litigation. Forest Oil asserted in its motion to vacate the Arbitration Award that the award must be vacated based on the evident partiality of Arbitrator Ramos. As evidence, Forest Oil offered the written disclosures that had been given to it by Amberson regarding Ramos's potential conflicts. Forest Oil pointed out that McAllens' counsel had never disclosed to Forest Oil that Arbitrator Ramos had some involvement with the Santillana litigation.

For purposes of determining the vacatur motion, Rolando Cantu and David Oliveira were deposed.[10] At his deposition, Rolando Cantu testified that neither he nor Amberson had expressly agreed to Ramos's serving as the mediator in Santillana litigation. Cantu explained that Oliveira had selected Ramos without

---

[10] The record does not reflect that Arbitrator Ramos was deposed. Forest Oil did, however, serve Ramos with two document subpoenas, requesting documents in his possession, or in the possession of his law firm, related to the Santillana litigation. Ramos filed a verified motion for protective order and motion to quash the documents subpoenas. In the verified motion, Ramos stated that "he does not have any documents responsive to this request. I have found no record of the *John R. Willis Management Partnership, Ltd. v. Chevron USA, Inc.* case [the Santillana litigation]." Although this motion is contained in a supplemental clerk's record, the record does not reflect that any similar statement by Ramos was admitted into evidence for purposes of determining the vacatur motion.

34

first consulting him or Amberson because he had previously told Oliveira that he and Amberson would agree to whomever Oliveira selected as mediator. Cantu stated that, as soon as he had received Oliveira's letter designating Ramos as the mediator, he had contacted Amberson. According to Cantu, Amberson immediately stated that he did not agree to Ramos' serving as mediator in the Santillana litigation. Cantu testified that there had never been an engagement letter with Ramos and that he had never spoken to Ramos about the mediation.

In his deposition, Oliveira testified that he did not discuss the Santillana litigation with Ramos. Oliveira stated that he had searched his correspondence and billing records and did not find any indication that he had ever contacted Ramos about the case. Oliveira testified that he may have spoken to Ramos's scheduler to obtain available dates for the mediation, but he did not specifically recall if he had done so. However, this was his usual practice with scheduling mediations with Ramos.

Oliveira explained that he had "been under the gun" by the trial court in the Santillana litigation to schedule mediation. He indicated that he had felt pressured to select a mediator. Oliveira stated that he did not recall speaking to Cantu or to Amberson about selecting Ramos as the mediator. He said that he had recently spoken to Cantu who had reminded him that Cantu had agreed to go along with whomever Oliveira had selected as mediator. Oliveira stated that was also his

35

recollection. He testified that there had been no engagement letter with Ramos to mediate the Santillana litigation, and Ramos had never been paid.

Amberson also filed an affidavit with respect to the vacatur motion. Amberson's affidavit testimony was in line with the deposition testimony of Cantu and Oliveira. Amberson's testimony indicated that Ramos did not know he had been considered for the mediator position in the Santillana litigation.

On appeal, Forest Oil acknowledges the testimony of Oliveira, Cantu, and Amberson, which indicates that Ramos was not contacted about the Santillana litigation and that Ramos was not aware that he had been considered for the mediator position in the Santillana litigation. Forest Oil, however, claims that, in light of the record, the testimony is not credible. Forest Oil asserts that the evidence offered with respect to this issue supports an inference that the parties had expressly agreed to Ramos' serving as the mediator in Santillana litigation and an inference that Ramos had been aware of his selection at that time.

Forest Oil points to the January 9, 2009 letter filed in the Santillana litigation. Forest Oil asserts that the letter shows that the parties had agreed that Ramos would serve as the mediator in the Santillana litigation. Forest Oil also points to the letter sent to Amberson and to Cantu by Oliveira's legal assistant. That letter stated that Ramos was available to mediate the Santillana litigation on February 10 and 11, 2009.

36

Forest Oil also cites disclosures made by the McAllens's counsel to Forest Oil regarding potential conflicts for Ramos with respect to his appointment as arbitrator in this case. Forest Oil characterizes some of these potential conflicts as being less significant than Ramos's connection to the Santillana litigation. Forest Oil also asserts that the McAllens had objected to a number of Forest Oil's choices for arbitrator for reasons much less consequential than Ramos's purported connection to the Santillana litigation.

Forest Oil also cites Cantu's and Amberson's testimony in which each testified that Oliveira had been informed that Ramos could not be the mediator in Santillana litigation because Ramos had a "conflict." Forest Oil asserts that this testimony shows that Ramos had an actual conflict that should have been disclosed to Forest Oil in this suit. However, a review of the cited testimony in context shows that Cantu and Amberson were stating that, should Ramos be appointed as mediator in the Santillana litigation, a conflict would arise with the McAllens' selection of him as arbitrator in this case. Cantu testified that he told Oliveira "we could not have Donato Ramos serve as a mediator, that there was a conflict." Ramos clarified that, by this statement, he was referring to the fact that Ramos was being considered as an arbitrator in this case. In his affidavit, Amberson stated that he told Cantu "to contact Mr. Oliveira and inform him that we agreed to mediate

the case but we never agreed to Mr. Ramos [as being mediator] and would not agree to use him due to the fact that it *would create a conflict*." (Emphasis added.)

On appeal, Forest Oil emphasizes the principles stated in *TUCO* that a neutral arbitrator exhibits evident partiality "if the arbitrator does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality." *TUCO*, 960 S.W.2d at 630. And "evident partiality is established from the nondisclosure itself, regardless of whether the nondisclosed information necessarily establishes partiality or bias." *TUCO*, 960 S.W.2d at 636. The Supreme Court of Texas recently reiterated these principles in *Tenaska Energy, Inc. v. Ponderosa Pine Energy*, *LLC*, No 12-0789, 2014 WL 2139215, at * 5 (Tex. May 23, 2014). However, *TUCO* and *Tenaska Energy* are distinct from this case in a significant way.

In *TUCO* and *Tenaska Energy*, there was no dispute that the arbitrator was aware of the facts giving rise to the evident partiality claim but had nonetheless failed to disclose those facts before the rendition of an arbitral award. *See Tenaska Energy*, 2014 WL 2139215, at * 6 (involving evident partiality claim arising from arbitrator's failure to disclose the full extent of his business relationship with party's attorneys); *TUCO*, 960 S.W.2d at 637 (concerning neutral arbitrator's failure to disclose a referral he received from a partisan arbitrator's law firm).

Here, in contrast to *TUCO* and *Tenaska Energy*, the parties disagree about whether Ramos knew that he was being considered to be mediator in the Santillana litigation.  An arbitrator has a duty to disclose facts *known* to him that might, to an objective observer, create a reasonable impression of the arbitrator's partiality. *Port Arthur Steam Energy*, 416 S.W.3d at 713–14.  Whether an arbitrator had knowledge of the relationship a party claims he failed to disclose is a fact issue material to an evident partiality claim.  *See Mariner Fin. Grp. v. Bossley*, 79 S.W.3d 30, 33 (Tex. 2002); *Port Arthur Steam Energy*, 416 S.W.3d at 714.

Although Forest Oil presented evidence to support its position that Ramos was aware that he had been selected as mediator in the Santillana litigation, it was within the province of the trial court, as the fact finder in the vacatur proceeding, to resolve the conflicts in the evidence and to judge the witnesses' credibility.  *See City of Keller v. Wilson*, 168 S.W.3d 802, 819–20 (Tex. 2005); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (recognizing that fact finder remains sole judge of witnesses' credibility and weight to be given their testimony).  Given the record, the evidence supported an implied finding by the trial court that Ramos was unaware of what had occurred in the Santillana litigation with respect to the parties' consideration of him for the position of mediator.  *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (setting forth legal and factual sufficiency standards of review when party attacking

39

adverse finding of fact has the burden of proof); *see also Swonke*, 2011 WL 1584809, at *6 (holding that evidence supported trial court's implied finding supporting denial of motion to disqualify arbitrator based on evident partiality). Thus, the parties' consideration of Ramos as mediator in Santillana litigation could not have influenced Ramos's partiality during the arbitration of this case. *See Mariner Fin. Grp.*, 79 S.W.3d at 33 (stating, "[T]he relationship could not have influenced [the arbitrator's] partiality if, in fact, he was unaware of it during the arbitration"); *see also Port Arthur Steam Energy*, 416 S.W.3d at 714.

We hold that Forest Oil has not shown that the trial court erred when it denied Forest Oil's motion to vacate to the extent the motion was based evident partiality grounds. We overrule Forest Oil's first issue.

## C. Exceeding Powers

The TAA requires a trial court to vacate an arbitration award when the arbitrators "exceeded their powers." TEX. CIV. PRAC. & REM. CODE ANN. § 171.088(a)(3)(A). In its fourth issue, Forest Oil asserts that the Award should be vacated because the Arbitration Panel exceeded its powers "by departing from interpretation and enforcement of the [Surface Agreement]" when it rendered the declaratory relief. Forest Oil complains that, in issuing its declarations, the Panel rewrote the Surface Agreement by injecting certain terms while removing or ignoring other terms.

40

"In arbitration conducted by agreement of the parties, the rule is well established that an arbitrator derives his power from the parties' agreement to submit to arbitration." *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 90 (Tex. 2011) (quotation omitted). An arbitrator exceeds his authority when he disregards the contract and dispenses his own idea of justice. *See Forged Components, Inc. v. Guzman*, 409 S.W.3d 91, 104 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Townes Telecomms., Inc. v. Travis, Wolff & Co*., 291 S.W.3d 490, 494 (Tex. App.—Dallas 2009, pet. denied). However, an arbitrator does not exceed his authority simply because he may have misinterpreted the contract or misapplied the law. *See Ancor Holdings, LLC v. Peterson, Goldman & Villani, Inc*., 294 S.W.3d 818, 830 (Tex. App.—Dallas 2009, no pet.) ("Thus, improvident, even silly interpretations by arbitrators usually survive judicial challenges."). The appropriate inquiry is not whether the arbitrator decided an issue correctly, but instead whether he had the authority to decide the issue at all. *D.R. Horton-Texas, Ltd. v. Bernhard*, 423 S.W.3d 532, 534 (Tex. App.—Houston [14th Dist.] 2014, pet. filed).

Here, Forest Oil does not dispute that the Arbitration Panel had the authority to interpret the Surface Agreement and to issue the declarations. Rather, Forest Oil complains that the Panel ignored the terms of the agreement, essentially re-writing

41

the agreement in issuing the declarations. In so doing, Forest Oil asserts that the Panel dispensed its own brand of justice, thus, exceeding its authority.

When analyzing whether an arbitrator has exceeded his authority when interpreting a contract, federal courts have held that an arbitrator's award is "legitimate only so long as it draws its essence" from the parties' agreement.[11] *Nationsbuilders, Ins. Servs., Inc. v. Houston Int'l Ins. Grp. Ltd.*, No. 05–12–01103–CV, 2013 WL 3423755, at *4 (Tex. App.—Dallas July 3, 2013) (mem. op.) (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S. Ct. 1358, 1361 (1960)). "To draw its essence from the agreement, the arbitrator's award 'must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the . . . agreement. . . . [T]he award must, in some logical way, be derived from the wording or purpose of the contract.'" *Id.* (quoting *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994)). The arbitrator's selection of a particular remedy is given even more deference than his reading of the underlying contract. *Id.* The remedy lies beyond the arbitrator's jurisdiction only if there is no rational way to explain the

---

[11] At least one other court has utilized the draws-its-essence test in a case governed by the TAA. *See, e.g., City of Laredo v. Mojica*, 399 S.W.3d 190, 197 (Tex. App.—San Antonio 2012, pet. denied) (stating that federal essence test was instructive in review under TAA); *see also Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 n.10 (Tex. 2008) (stating that whether a case is governed by the FAA or TAA, "many of the underlying principles are the same; where appropriate, this opinion relies interchangeably on cases that discuss the FAA and TAA").

remedy handed down by the arbitrator as a logical means of furthering the aims of the contract. *Id.*

To determine whether an award is beyond the scope of the arbitrator's powers, we look only at the result. *Id.* "'The single question is whether the award, however arrived at, is rationally inferable from the contract.'" *Id.* (quoting *Anderman/Smith Operating Co. v. Tenn. Gas Pipeline Co.*, 918 F.2d 1215, 1219 n.3 (5th Cir. 1990)); *see Ancor Holdings*, 294 S.W.3d at 829 ("The award must be derived in some way from the wording and purpose of the agreement, and we look to the result reached to determine whether the award is rationally inferable from the contract."). We are mindful that an arbitrator has broad discretion in fashioning an appropriate remedy. *See Roe v. Ladymon*, 318 S.W.3d 502, 523 (Tex. App.—Dallas 2010, no pet.).

Forest Oil complains of the Award's declarations that require Forest Oil to locate and remove non-hazardous materials from the Ranch. It also complains of the declarations stating that Forest Oil is solely responsible for future remediation costs "related to pollutants, contaminants, and hazardous and non-hazardous materials . . . under the lands covered by the Surface Agreement."

Forest Oil asserts that the Surface Agreement requires removal and remediation of only hazardous materials and does not address non-hazardous materials, pollutants, or contaminants. Forest Oil claims that the Surface

43

Agreement does not require it to "locate" any materials. It also asserts that the Surface Agreement limited Forest Oil's obligations geographically to its lease; it was not obligated to clean up the entire Ranch. Forest Oil points out that other oil companies have leases on the Ranch, and it asserts that it is not responsible for contamination caused by those companies.

Forest Oil further complains that the declarations state that it has a "continuing obligation" to remove and to remediate by products from its operations. Forest Oil avers that the Surface Agreement only requires it to conduct these activities "if, as and when required by law" or when a well is "plugged or abandoned." Forest Oil also asserts the declarations require it to do more remedial work to the surface of the land when a well is plugged or abandoned than it had agreed to do.

Lastly, Forest Oil complains of the declaration stating that it is obligated to reimburse the McAllens for future costs and expenses incurred in conducting investigations, which identify additional locations requiring remediation on the Ranch resulting from Forest Oil's operations. Forest Oil asserts that the Surface Agreement does not provide for such reimbursement.

As discussed, paragraphs 4 and 5 of the Surface Agreement address Forest Oil's obligations with regard to the care and restoration of drilling pad sights. Paragraph 8 of the agreement provides:

8. Lessees [including Forest Oil] will not bring on the Leases any hazardous material . . . . Further Lessees agree (1) to remove from the Leases, if, as and when required by law, any hazardous material placed or released thereon by Lessees, (2) to perform remedial work where the need therefore arises as a result of and is caused by Lessees' operations or activities on the Leases, and (3) to comply in all respects with all federal, state and local governmental laws and regulations governing operations by Lessees and remedial work on or associated with the Leases.

The Arbitration Panel may have interpreted Paragraph 8 to encompass the obligations found in the declarations. Specifically, the arbitrators may have interpreted the broad provisions in clauses (2) and (3) to encompass the following as a logical means of furthering the aims of the Surface Agreement provisions, requiring Forest Oil to be responsible for the by-products of its operations:

- Include materials other than hazardous wastes;

- Require Forest Oil to locate such materials;

- Obligate Forest Oil to remove such materials and to remediate on a continual basis;

- Require Forest Oil to be responsible for pollution caused by its operations even if it is located off its lease; and

- Oblige Forest Oil to reimburse the McAllens for future costs and expenses incurred in conducting investigations that identify additional locations requiring remediation on the Ranch.

Even if the arbitrators made a mistake in the application of the law regarding what Forest Oil was required to do to comply with federal, state, and local

45

governmental laws and regulations, such a mistake does not support vacatur of the Award on the ground that the arbitrators exceeded their authority. *See Ancor Holdings*, 294 S.W.3d at 830. Neither would any misreading or misinterpretation of the Surface Agreement. *See id.*

Here, the parties agreed to submit disputes arising out of the Surface Agreement to a panel of arbitrators rather than to a judge. *See id.* at 832 (citing *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S. Ct. 364, 370 (1987)). They also agreed to accept "whatever reasonable uncertainties" might arise from the process. *See Ancor Holdings*, 294 S.W.3d at 832. Thus, "it is the arbitrators' view of the facts and of the meaning of the contract that they have agreed to accept."[12] *Ancor Holdings*, 294 S.W.3d at 832 (citing *Misco, Inc*., 484 U.S. at 37–38, 108 S. Ct. at 370).

We do not decide whether the arbitrators made a correct decision under the law and facts of this case. But we do conclude that the declarations can be read to derive from the wording and purpose of the Surface Agreement. In other words, they are rationally inferable from the contract. Thus, the declarations are not so devoid of support that we could conclude that the arbitrators were merely

---

[12] Forest Oil also asserts that the declarations violate public policy, which favors protecting the right to contract and to have a contract enforced as written. However, that policy also serves to hold Forest Oil to its agreement to arbitrate. As stated, Forest Oil must accept the consequences of that decision.

dispensing their own idea of justice.  In sum, the Arbitration Panel did not exceed its authority in rendering the declarations.

We overrule Forest Oil's fourth issue.

**D. Damages**

In its fifth issue, Forest Oil asserts that the damages awarded by the Panel require vacatur.  Forest Oil complains that actual damage awards of $15,000,000 to the McAllens and of $500,000 to Mr. McAllen resulted from either gross mistake or from manifest disregard for the law.  Forest Oil also assails the Panel's award of exemplary damages by asserting that it violated the contractual limits on the arbitrators' authority.

### 1.    *Gross Mistake*

Gross mistake is a Texas state common-law standard that has been used to attack arbitration awards.  *Callahan & Assocs.*, 92 S.W.3d at 844.  A "gross mistake" is a mistake by the arbitrator that implies bad faith or failure to exercise honest judgment.  *Ouzenne*, 2012 WL 1249420, at *2 (citing *Anzilotti v. Gene D. Liggin, Inc.*, 899 S.W.2d 264, 266 (Tex. App.—Houston [14th Dist.] 1995, no writ)).  Gross mistake results in a decision that is arbitrary or capricious.  *Universal Computer Sys., Inc. v. Dealer Solutions, L.L.C.*, 183 S.W.3d 741, 752 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).  An honest judgment made after due

47

consideration given to conflicting claims, however erroneous, is not arbitrary or capricious. *Id.*

### a. Actual Damage Award to the McAllens of $15,000,000

In its brief, Forest Oil states that it presumes the $15,000,000 actual damages award was for the diminished value of the McAllen Ranch caused by Forest Oil's environmental contamination. Forest Oil does not dispute that the McAllens offered expert testimony indicating that the value of the Ranch had been diminished by $19.65 million as a result of the environmental contamination. Forest Oil acknowledges the expert's testimony at the arbitration hearing, which details and explains the expert's damages model.

Under the expert's model, the value of the entire 27,289.5 acre Ranch, unimpaired by environmental contamination, was $65,500,000. The expert explained that, after considering case studies of other ranches in the area that had suffered environmental contamination, he determined that the unimpaired value of the Ranch should be reduced by 30 percent, or $19.65 million. The expert acknowledged that, in making this determination, he had difficulty finding comparable properties to the Ranch in terms of size and in terms of finding properties in the same stage of remediation.

The expert determined that the diminished value of the Ranch was $45,850,000. The expert acknowledged that the diminished value could change as the remediation process continued on the Ranch. The expert also explained that his model assessed the diminution in value for the entire acreage of the Ranch because uncertainty existed as to the full extent of the contamination. He stated that there was a risk the contamination was more wide-spread then currently known and that this affected the value of the entire property.

Forest Oil claims that the Panel's presumed reliance on the expert's "inherently flawed" damages model was in bad faith and evince a failure by the Panel to exercise honest judgment. In making its claim, Forest Oil criticizes the expert's damages model because it was based on an interim diminution-in-value calculation; it was not based on a permanent diminution-in-value calculation for the property.

To the extent that the recovery of such interim damages is not legally permitted, any error by the Arbitration Panel in permitting the McAllens' recovery of such damages would be a legal error. The doctrine of gross mistake does not extend to mere mistakes of fact or law. *See Humitech Dev. Corp. v. Perlman*, No. 05–12–00857–CV, 2014 WL 1007831, at *8 (Tex. App.—Dallas Feb. 27, 2014, no pet.); *see also Universal Computer Sys.*, 183 S.W.3d at 752 (recognizing that judicial review of an arbitration award "is so limited that even a mistake of fact or

law by the arbitrator in the application of substantive law is not a proper ground for vacating an award").

Moreover, we are mindful that "[a] judgment rendered after honest consideration given to conflicting claims, no matter how erroneous, is not arbitrary or capricious." *Xtria L.L.C. v. Int'l Ins. Alliance, Inc*., 286 S.W.3d 583, 598 (Tex. App.—Texarkana 2009, pet. denied). Here, the record shows that the testimony of the McAllens' expert comprised 266 pages. The expert explained his damages model and his methodology in detail. And he was subject to extensive direct and cross-examination.

Forest Oil describes the expert's damages calculation as speculative because it was based on the possibility of unknown contamination. Forest Oil asserts that the expert's methodology was flawed and did not properly consider the highest and best use of the property. It complains that the expert's reasoning in determining the diminution in value contains analytical gaps. In making these arguments, Forest Oil critiques the expert's opinion testimony in terms of whether it would have been admissible testimony in a trial court. Indeed, Forest Oil avers that the $15,000,000 award springs from gross mistake because it is based on no *admissible* evidence. However, as the Supreme Court of Texas has recognized, "For efficiency's sake, arbitration proceedings are often informal; procedural rules are relaxed, *rules of evidence are not followed*, and no record is made." *Nafta*

*Traders* 339 S.W.3d at 101 (emphasis added). Thus, we cannot conclude that the Arbitration Panel's reliance on expert testimony, which may not have met the standards for admissibility at trial, serves to show the Panel acted in bad faith.

In sum, Forest Oil is essentially arguing that the Arbitration Panel was wrong in its view of the evidence, its application of the substantive law to the evidence, and ultimately in its decision. Such contentions may show a mistake of fact or law, but they do not rise to the level of gross mistake. *See Humitech Dev. Corp*, 2014 WL 1007831, at *8; *Ouzenne*, 2012 WL 1249420, at *2.

### b. Award of $500,000 in Actual Damages to Mr. McAllen

Forest Oil also asserts that the award of $500,000 in actual damages awarded to Mr. McAllen resulted from gross mistake. Mr. McAllen sought recovery of damages from Forest Oil for common-law assault. He pursued this claim based on his allegation that he had been exposed to NORM contaminated pipe donated by Forest Oil for construction of the rhinoceros pens. In his pleading, Mr. McAllen requested damages for personal injury and for mental anguish caused by his exposure to NORM.

Forest Oil recognizes that the Panel did not state the basis on which it awarded Mr. McAllen $500,000 in actual damages. Nonetheless, Forest Oil asserts that the award resulted from gross mistake because Mr. McAllen did not offer sufficient evidence to support mental anguish damages. Forest Oil avers that Mr.

51

McAllen's testimony at the arbitration hearing, indicating that he feared contracting cancer from his exposure, could not support the damage award.

Citing *Temple-Inland Forest Products Corporation v. Carter*, 993 S.W.2d 88, 93 (Tex. 1999), Forest Oil asserts, "Texas law does not allow recovery of mental-anguish damages based on fear of contracting a disease." In this regard, Forest Oil is asserting that the Panel made a legal error, or a mistake in applying the substantive law to the evidence. As stated, the doctrine of gross mistake does not extend to mere mistakes of law. *See Humitech Dev. Corp.*, 2014 WL 1007831, at *8. We also note that the fact that the relief granted by the arbitrators could not or would not be granted by a court of law or equity is not a ground for vacating or refusing to confirm the award. TEX. CIV. PRAC. & REM. CODE ANN. § 171.090.

We conclude that Forest Oil has not shown that the Arbitration Panel acted in bad faith or failed to exercise honest judgment in rendering the actual-damage award in this case. Thus, the trial court properly denied Forest Oil's motion to vacate the Award based on gross mistake.

### 2. Manifest Disregard for the Law

Forest Oil asserts for the first time on appeal that the arbitrators manifestly disregarded the law in awarding actual damages. Forest Oil did not present this doctrine as a basis to vacate the Award in the trial court. Because Forest Oil failed to preserve this point for appellate review, we decline to address whether this

doctrine requires vacatur of the Award. *See* TEX. R. APP. P. 33.1(a); *Saqer v. Ghanem*, No. 09–07–00519–CV, 2008 WL 5263359, at \*7 (Tex. App.—Beaumont Dec. 18, 2008, no pet.) (mem. op.) (holding manifest disregard for the law ground for vacatur waived on appeal when not raised in trial court).

### 3. *Exemplary Damages*

Forest Oil also asserts that the trial court should have vacated the Panel's exemplary damage award of $500,000 because the arbitration clause provided, "The arbitrators will have the authority to award punitive damages where allowed by Texas substantive law." Forest Oil asserts that this language permits expanded judicial review of the exemplary damages award. Forest Oil invites us to conduct a sufficiency of the evidence review to determine if the evidence in the record supports the exemplary damage award. In support of its position, Forest Oil cites the supreme court's decision in *Nafta Traders*.

There, the supreme court determined that parties, by contract, may agree to allow for judicial review of an arbitration award for reversible error. *See Nafta Traders*, 339 S.W.3d at 101. In that case, the arbitration agreement stated, "The arbitrator does not have authority (i) to render a decision which contains a reversible error of state or federal law, or (ii) to apply a cause of action or remedy not expressly provided for under existing state or federal law." *Id.* at 88. The supreme court concluded this language meant that the arbitrator lacked the power

to commit a reversible error of law and provided the courts the authority to review the arbitrator's decision for errors of law under the courts' authority to determine whether the arbitrator exceeded its powers.[13]  *Id.* at 101.  However, the supreme court directed, "[A]bsent clear agreement, the default under the TAA, and the only course permitted by the FAA, is restricted judicial review."  *Id.*

Unlike in *Nafta Traders*, the arbitration provision here does not show a clear agreement by the parties to provide the courts with the authority to review, for errors of law, the arbitrators' decision to award exemplary damages. Conspicuously absent from the arbitration provision is the language present in *Nafta Traders*, stating that the arbitrator was without authority to render a decision containing a reversible error of law.  Moreover, in contrast to the language in *Nafta Traders*, the language here is permissive in nature rather than restrictive.  The arbitration clause informs the arbitrators that they may award punitive damages as provided in the substantive law of Texas.  There is no indication that such award may be reviewed for legal error.  Without clear language in the arbitration

---

[13]    The supreme court remanded the case to the court of appeals, which conducted a full sufficiency-of-the-evidence review.  *See Quinn v. Nafta Traders, Inc.*, 360 S.W.3d 713, 722 (Tex. App.—Dallas 2012, pet. denied).

agreement, we have no authority to conduct an expanded judicial review of the exemplary-damage award as requested by Forest Oil.[14]

We overrule Forest Oil's fifth issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

---

[14]    Forest Oil also cites section 41.003(d) of the Civil Practices and Remedies Code which provides, "Exemplary damages may be awarded only if the jury was unanimous in regard to finding liability for and the amount of exemplary damages." TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(d) (Vernon Supp. 2013). Forest Oil points out that the arbitration decision was not unanimous in this case. However, the unanimity requirement found in section 41.003(d) does not involve "substantive law" as referenced in the arbitration provision; rather, it is a procedural law. *See McGilvray v. Moses*, 8 S.W.3d 761, 764–65 (Tex. App.—Fort Worth 1999, pet. denied) (defining substantive law and procedural law).